**KASOWITZ LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
Robert W. Bosslet (SBN 278027)
RBosslet@kasowitz.com
1801 Century Park East, Suite 1830
Los Angeles, California  90067
Telephone:    (424) 288-7900
Facsimile:    (424) 288-7901

Dwayne A. Amos (*pro hac vice* application forthcoming)
DAmos@kasowitz.com
Kristine B. Abrenica (*pro hac vice* application forthcoming)
KAbrenica@kasowitz.com
1633 Broadway
New York, New York  10019
Telephone:    (212) 506-1700
Facsimile:    (212) 506-1701

 *Attorneys for Plaintiff*
 *Hollywood Foreign Press Association*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOLLYWOOD FOREIGN PRESS ASSOCIATION,<br><br>           Plaintiff,<br><br>     v.<br><br>JAY PENSKE, an individual; GREGORY GOECKNER, an individual; PENSKE MEDIA CORPORATION, a Delaware corporation; and GOLDEN GLOBE FOUNDATION, a California non-profit corporation,<br><br>           Defendants. | No.<br><br>**COMPLAINT FOR:**<br><br>1. **Monopolization**<br>2. **Attempted Monopolization**<br>3. **Conspiracy to Monopolize**<br>4. **Unlawful Restraint on Trade [15 U.S.C. § 1]**<br>5. **Unlawful Corporate Acquisition**<br>6. **Unlawful Restraint on Trade [Cal. Bus. & Prof. Code § 1670 et seq.]**<br>7. **Unfair Trade Practices**<br>8. **Unfair Competition**<br>9. **Rescission and Cancellation of** |

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

Assignment [Assignment Unlawful Due to Fraud, Violations of State and Federal Antitrust Laws, and Legal Malpractice]

10. Rescission and Cancellation of Assignment [Assignment Tainted by APA – Fraudulent Inducement]

11. Rescission and Cancellation of Assignment [Assignment Tainted by APA – Breach of Fiduciary Duty – Hoehne]

12. Rescission and Cancellation of Assignment [Assignment Tainted by APA – Breach of Fiduciary Duty – Boehly]

13. Rescission and Cancellation of Assignment [Assignment Tainted by Legal Malpractice and Breach of Fiduciary Duty]

14. Declaratory Judgment

15. Fraudulent Misrepresentation

16. Transaction Void For Violation of Corporate Authority

17. Unjust Enrichment

18. Imposition of Constructive Trust

19. Legal Malpractice and Breach of the Fiduciary Duty of Care

20. Breach of the Fiduciary Duty of Loyalty

**DEMAND FOR JURY TRIAL**

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

2

COMPLAINT

Plaintiff Hollywood Foreign Press Association ("HFPA" or "Plaintiff"), for its Complaint against Defendants Jay Penske ("Penske"), Gregory Goeckner ("Goeckner"), Penske Media Corporation ("Penske Media"), and Golden Globe Foundation ("GGF," and together with Penske, Goeckner, and Penske Media, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1. This case arises from a clandestine scheme to fraudulently acquire the prestigious and valuable 80-year-old Golden Globe Awards (the "Golden Globes"), destroy their founder and former owner, the HFPA, and exert monopolistic control over the Hollywood trades, awards, and advertising markets, all in violation of state and federal unfair competition and antitrust laws. The scheme was and continues to be perpetrated, in part, through the misuse of a California non-profit organization— the GGF—which serves as a vehicle to further the illegal and anticompetitive conduct.

2. Like the infamous Edison Trust that spawned the dawn of Hollywood in the early 20th century, this modern-day trust has operated with brazenness to consolidate market power and stifle competition. The trust is orchestrated and controlled by Defendant Penske and his billionaire associate, Todd Boehly ("Boehly"), who have leveraged their influence to dominate the industry. While the public may be aware of their outsized presence in Hollywood, what has remained obscured until now is the corrupt and anticompetitive manner by which they acquired one of their most valuable assets—the Golden Globes. This acquisition exemplifies Penske's and Boehly's willful and exclusionary conduct aimed at profiteering, maintaining their monopoly power, harming competition, stifling innovation, and injuring the public interest.

3. Penske, through Defendant Penske Media, has established an anticompetitive trust in the entertainment awards market, wherein he owns and/or controls at least half a dozen major awards shows, almost all of the major Hollywood

trade publications that sell the advertising packages for award contestants while covering and heavily influencing the awards circuit, the company that controls the market for predicting winners for those awards shows, and the data company that measures statistics for award eligibility.

4.      But that wasn't enough for Penske.  On information and belief, beginning in or around 2021, Penske colluded with Boehly to purchase one of the major film and television awards shows—the Golden Globes—through a corrupt Asset Purchase Agreement (the "APA"), and at the same time dismantle the organization that founded those awards in 1944 and had owned them ever since (the HFPA), all in an effort to further cement control and eliminate competition.  In doing so, Penske and Boehly—who, through their commercial enterprises, also have substantial ownership interests in major film and television production companies such as A24 Films LLC ("A24") and Media Rights Capital ("MRC")—would not only solidify a vertical and horizontal monopoly on the awards market, but would also effectively position themselves to control and exclude members of the domestic and foreign press, and ultimately control the entertainment news disseminated to the general public, while maintaining a monopoly over streams of advertising revenue in that market.

5.      On information and belief, as part of their scheme, in or around February 2021, Boehly and Penske surreptitiously instigated a boycott of the HFPA and the 2022 Golden Globes (the "Boycott").  Boehly and Penske used Penske's Hollywood trade publications (in which Boehly already held an indirect interest), including *Variety* and *The Hollywood Reporter*, to promote and support the Boycott.  That Boycott would then become the pretext for Boehly to infiltrate the HFPA and acquire the Golden Globes.

6.      Penske is no stranger to this sort of anticompetitive conduct.  In fact, reports indicate that at or around the time of the Boycott, Penske was instigating derogatory press about his competitors at rival trade publications in an effort to

further consolidate his stranglehold on the market.

7. Within months of the Boycott's inception, Boehly would become interim Chief Executive Officer ("CEO") of the HFPA, and within the following year, Penske and Boehly would jointly own the Golden Globes. To accomplish this, Boehly enlisted then-HFPA President Helen Hoehne ("Hoehne"), who is currently the President of Boehly and Penske's new for-profit company Golden Globes, LLC f/k/a Eldridge Globes, LLC ("Globes LLC"), to facilitate their efforts to acquire the Golden Globes regardless of whether that was in the best interest of the HFPA and its members. In 2022, Hoehne—enticed by the prospect of a prominent role in Penske and Boehly's media empire and a substantial pay raise, which Penske and Boehly delivered—worked in tandem with Boehly to advance a markedly corrupt purchase process that allowed Boehly's company Eldridge Industries, LLC ("Eldridge") to purchase the Golden Globes.

8. In or around January 2023, Penske and Boehly formed a joint venture between Penske Media and Eldridge named Penske Media Eldridge, which then acquired Dick Clark Productions ("DCP"). DCP immediately thereafter assumed control of the Golden Globes, with Penske in charge of its operations.

9. The malfeasance underpinning the sale of the Golden Globes is extensive, and the paper trail is damning. HFPA members were compelled to approve the transaction in a sham process tainted by fraud, conflicts of interest, and myriad breaches of fiduciary duty on the part of then-HFPA President Hoehne, then-HFPA General Counsel and Chief Operating Officer ("COO") Goeckner, and Boehly. Hoehne arranged for Boehly to become the interim CEO of the HFPA during the bid process—thus acting as both buyer and seller—which, not surprisingly, gave Boehly a markedly unfair advantage over other bidders.

10. At every turn, Hoehne, Goeckner, and Boehly endeavored to ensure that Eldridge would succeed in the effort to purchase the Golden Globes at a bargain, including by obstructing competing offers, making false promises to HFPA members

to induce their ratification of the transaction, and improperly amending the resulting APA to deprive the HFPA of more than $25 million in promised consideration. Hoehne and Boehly used bait-and-switch tactics to procure an unconscionable contract that ultimately turned on supplementary take-it-or-leave-it agreements drafted unilaterally by Eldridge. HFPA members, the majority of whom do not speak English as a first language, had less than ten days to review the 400-plus page contract and were effectively precluded from discussing it with outside counsel. When members asked for additional time, Hoehne—acting at Boehly's direction and against the express advice of the HFPA's outside counsel—refused to grant the additional time, pushing the contract through and ignoring the concerns of her confused constituents.

11.     Boehly and Eldridge actively concealed from the HFPA and the public Penske's involvement in the acquisition of the Golden Globes. Because Penske Media already possessed a monopoly on the Hollywood trades and a significant portfolio of awards shows, members of the HFPA—an organization whose purposes include preserving and promoting *foreign* journalism's connection to domestic film and awards, in part through participation in outlets and ventures that directly compete with Penske's business—would never have approved the APA if they knew Penske was involved. On information and belief, Penske and Boehly were aware of this resistance, and although they fully intended for Penske to be a co-owner of the Golden Globes well before the APA vote, they deliberately concealed Penske's involvement in the acquisition until after the APA was approved.

12.     Just three months after the APA was signed, Penske emerged and assumed complete control of the Golden Globes, with HFPA members informed that he would be running operations going forward. At that point, all that was left to obtain regulatory approval of the APA was for Boehly and Penske to dissolve the HFPA, thereby avoiding discovery of the myriad acts of malfeasance underlying the transaction.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

6

COMPLAINT

13.    Under California's law governing non-profit organizations, Penske and Boehly's for-profit entities could not receive all of the HFPA's assets, and any transaction involving the transfer of those assets would require approval by the California Attorney General (the "AG").  To overcome these hurdles and fortify Penske and Boehly's unlawful scheme, the non-profit GGF was formed as a successor to the HFPA's philanthropic arm.  The APA then provided that, upon dissolution, the HFPA would assign all of its assets to the GGF, and the consideration paid by Eldridge for purchasing the Golden Globes would ultimately be paid to the GGF.

14.    In an effort to obtain the AG's approval of the transaction, the lawyers executing the transaction told the AG that Eldridge would pay approximately $44 million in cash to the GGF.  But that, like so much else related to the APA, turned out to be a lie.  Boehly, through his co-conspirators Hoehne (who was still the HFPA's President at the time) and Defendant Goeckner (who was still the HFPA's General Counsel and COO), illegally and surreptitiously amended the APA without member approval to deprive the HFPA of $27.5 million of that promised consideration.  As a result, Eldridge paid only approximately $20 million to the GGF for the purchase of the Golden Globes.  Goeckner breached his fiduciary duties to the HFPA to facilitate this unlawful conversion, and in doing so, solidified himself as one who would put his own personal interests and the interests of Hoehne, Penske, and Boehly over those of the HFPA.  It would not be the last time Goeckner would do Penske's and Boehly's bidding.

15.    Although the GGF is a purportedly independent non-profit organization, for all intents and purposes it is an extension of the for-profit entity Penske and Boehly formed through the APA—Globes LLC.  Indeed, HFPA members could only become members of the GGF if they accepted employment with Boehly and Penske's for-profit company (a condition that HFPA members were made aware of only *after* they voted to approve the APA).  And Penske, Boehly, and the GGF—aided by

Goeckner—have sought to utilize the GGF to unlawfully divert charitable assets to serve Penske and Boehly's non-charitable commercial interests, in clear violation of charitable asset protection laws.  This includes attempting to use more than $275,000 in charitable funds for the for-profit Globes LLC's Golden Globes viewing party.

16.    On information and belief, to cement their stranglehold over the supposedly independent GGF, Penske, Boehly, and Hoehne strategically installed their co-conspirator, Goeckner, as the GGF's CEO.

17.    On information and belief, Goeckner had dreamed for more than a decade of becoming the CEO of the HFPA, but that role was denied him.  When Goeckner was finally presented with the opportunity to get his dream job through the GGF, his sole focus became doing whatever he had to do to secure that role, even when doing so meant betraying his own colleagues and clients at the HFPA, as well as his ethical duties as an attorney.

18.    Goeckner's installation as the GGF's CEO was merely one act in that calculated betrayal.  While still serving as the HFPA's General Counsel and COO, Goeckner systematically orchestrated the premature liquidation of the HFPA's assets to advance Penske and Boehly's anticompetitive scheme and force the HFPA into dissolution before their corrupt machinations could be exposed.

19.    To achieve this end, Goeckner, working hand-in-hand with Hoehne, hastily rammed through a resolution that would ultimately culminate in an Assignment and Assumption agreement transferring virtually all HFPA assets to the GGF in advance of the HFPA's dissolution (the "Assignment")—a move directly contrary to the HFPA's interests.  In frustration of that goal, however, the HFPA's Board of Directors (the "Board") voted to withhold a $5 million reserve (the "Reserve") and defer transferring any remainder of that Reserve until the HFPA's ultimate dissolution.  With misconduct allegations surfacing, this Reserve represented the HFPA's lifeline—funds needed to wind down ethically and to investigate the brewing scandal, as the organization was required to do under

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

California law.

20. For Goeckner and his co-conspirators, leaving the HFPA with resources to investigate their misconduct was unacceptable. To shut down that investigation, Goeckner—who was still acting as the HFPA's General Counsel—weaponized his legal expertise against his own clients. Just four days before leaving the HFPA to assume the CEO role at GGF, Goeckner buried a backdoor provision in a different resolution—a clause purporting to allow any HFPA officer to unilaterally transfer funds to the GGF without the Board's approval. Though glaringly obvious in hindsight, Goeckner's maneuvers were skillfully camouflaged from the unwitting HFPA Board.

21. Goeckner's backdoor provision did not actually permit depletion of the Reserve; under HFPA bylaws, the Reserve could only lawfully be depleted with "specific advance authorization by the Board of Directors"—a fact that Goeckner in his role as General Counsel undoubtedly knew and understood. But Goeckner's covert provision in the resolution created an illusion of legitimate authority that he knew would make it easier for him to induce illicit transfers and drain the HFPA's Reserve. Indeed, less than 30 days into his GGF CEO tenure, Goeckner successfully induced the HFPA's Treasurer (the "Treasurer")—who reasonably relied on Goeckner's good faith and professed goal of protecting the HFPA's financial interests—to transfer approximately $4 million from the protected Reserve to the GGF.

22. On information and belief, when the HFPA requested the return of the misappropriated funds—citing the need to investigate the circumstances of the APA and defend itself in a confidential matter relating to the APA—Goeckner unleashed a campaign of intimidation and lies, threatening GGF personnel and Board members with personal liability and retaliatory lawsuits from co-conspirators Penske and Boehly's corporate network and falsely claiming that the AG opposed returning the funds, all to ensure that the stolen money would remain beyond the HFPA's reach.

23.    Penske and Boehly have systematically weaponized the GGF into a vehicle to further their illicit scheme.  On information and belief, Penske and Boehly have personally and/or through their corporations made threats and/or promises to the GGF to induce cooperation with Boehly and Penske in their efforts to force the HFPA to dissolve, including, but not limited to, offering to license intellectual property to the GGF; inviting GGF personnel to private meetings at Penske's personal residence and exclusive venues; and offering GGF members extended Golden Globes voting rights and ballroom seats for the awards ceremony if they (falsely) assert that all of the HFPA's claims relating to the APA have been assigned to the GGF and sign waivers purporting to release those claims, agree not to assist the HFPA in any way in the confidential matter, and induce the HFPA to dissolve. Such acts, which the HFPA believes will be further exposed through discovery in this matter, could well constitute illegal witness tampering and obstruction of justice.

24.    Goeckner and the GGF's collusion with Penske and Boehly is further evidenced by the fact that Globes LLC's counsel has improperly shared with Goeckner and the GGF confidential materials relating to a confidential matter currently pending between the HFPA and Globes LLC.

25.    To date, Penske and Boehly have successfully carried out their scheme and Penske has obtained monopolies in at least three relevant markets, as further defined herein: (1) Hollywood Trade Publications; (2) Secondary Awards; and (3) For Your Consideration ("FYC") Advertising (collectively, the "Relevant Markets").  Through Penske's trust, Penske and Boehly have taken concerted measures to exclude the HFPA and its members from these markets, deprive the HFPA and its members of business opportunities and their ability to protect and promote the interests of foreign journalists, and reduce competitive output in favor of the journalists who work for Penske's trust.

26.    Penske and Boehly have used their monopolies and anticompetitive conduct to obtain unfair advantages in the Relevant Markets by, among other things:

(i) structuring awards in a manner that excludes from the market anyone who cannot or will not purchase FYC advertisements from Penske's trades; (ii) controlling the market for those advertisements through their monopoly on the Hollywood Trade Publications that issue the FYC packages; (iii) implementing pay-to-play mechanisms and supracompetitive prices that enrich Defendants while inhibiting access to and fairness of awards shows; (iv) using their monopoly on Hollywood Trade Publications to improperly influence the awards circuit; (v) inducing journalists to withdraw from participation in competing awards programs; (vi) ensuring that their own films, television programs, and other content produced by A24 and MRC receive top awards; (vii) using Penske's data company to serve as gatekeeper for award consideration; and (viii) using Penske's award prediction company to dominate the market on awards show odds-making and further exert improper influence on the awards circuit.

27.   Penske and Boehly are also unlawfully restraining trade and chilling competition, including by excluding journalists not associated with Penske's trades from access to the awards circuit and taking measures to silence journalists who report critically on their unlawful trust.  For example, at the 2026 Golden Globes, journalists who were granted exclusive access in prior years were turned away completely, and exclusive access was instead granted to journalists from Penske's trades.

28.   Journalists have reported that Penske's trust has created a climate of fear in which members of the press are afraid to compete with Penske and Boehly or to speak truthfully about their corruption for fear of being blacklisted or other retaliation.

29.   Penske and Boehly could not have succeeded with their scheme and achieved their monopolies without the assistance of their co-conspirators Goeckner and Hoehne, both of whom reaped significant personal financial benefits as rewards for their malfeasance and breaches of fiduciary duties.  Hoehne is now the President

of Globes LLC, where she enjoys significantly higher compensation and an enhanced lifestyle compared to her previous role leading the non-profit HFPA. Goeckner is now the CEO of GGF, earning over $300,000 annually and achieving his long-held career aspiration.

30.    As of the filing of this Complaint, Defendants continue to conspire in an attempt to force the HFPA to dissolve before their malfeasance can be fully investigated and exposed. Indeed, just days before the filing of this Complaint, Penske and Boehly, through their corporate enterprises, formally offered to GGF members extended Golden Globes voting rights and ballroom seats at the Golden Globes, but expressly stated that those benefits were contingent on—among other things—the HFPA dissolving and the GGF affirmatively assisting Penske and Boehly to make that happen.

31.    Pursuant to the foregoing, and as set forth in detail below, the Assignment between the HFPA and the GGF is part of Penske's unlawful scheme that violates antitrust and unfair competition laws, and is also (like the APA from which it derives) tainted by fraud and breaches of fiduciary duty, and must therefore be declared void; all Defendants are liable for antitrust damages and damages caused by their unfair trade practices under state and federal law; and Goeckner is liable for damages caused by his personal misconduct, including fraudulent inducement, breach of fiduciary duty, and legal malpractice.

32.    The HFPA also seeks public injunctive relief pursuant to California's Unfair Competition Law ("UCL") prohibiting Defendants from engaging in unlawful, unfair, and fraudulent business practices that threaten future harm to the general public. Specifically, Defendants orchestrated and participated in a clandestine scheme to fraudulently acquire the Golden Globes, dismantle the HFPA, and exert monopolistic control over Hollywood trades and the awards circuit, thereby violating California's antitrust and consumer protection statutes. Defendants misused the California non-profit organization GGF, engaged in anticompetitive

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

12
COMPLAINT

conduct through the creation of a trust in the entertainment awards market, and executed a corrupt corporate acquisition. Defendants orchestrated a boycott, engaged in fraudulent acquisition processes, concealed material facts, breached fiduciary duties, and committed legal malpractice, all while intimidating stakeholders and weaponizing non-profit entities to manipulate the market, restrain trade, exclude journalists, and censor critical reporting. These actions constitute unlawful, unfair, and fraudulent practices under the UCL, as they threaten incipient violations of antitrust and other laws, violate public policy, and harm competition and consumers. Plaintiff requests that the Court issue an injunction to prevent Defendants from continuing these practices and to protect the public from further harm.

33.    The HFPA also seeks injunctive relief under federal antitrust law on behalf of its members, who suffered injuries that are inextricably intertwined with the injuries to customers and competitors in the Relevant Markets.

## JURISDICTION AND VENUE

34.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a) and Section 4 of the Sherman Act, 15 U.S.C. § 4, and has supplemental jurisdiction over the HFPA's claims arising under California law.

35.    The Court has personal jurisdiction over Defendants because they reside and/or conduct business in the State of California.

36.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events and omissions giving rise to the HFPA's claims occurred in this district. Venue also is proper in this district pursuant to 28 U.S.C. § 1391(c) because all Defendants are subject to personal jurisdiction in this district and reside in this district.

## PARTIES AND SELECT NON-PARTIES

37.    Plaintiff HFPA is a California non-profit mutual benefit corporation incorporated under Section 501(c)(6) of the Internal Revenue Code.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

13

COMPLAINT

38.    On information and belief, Defendant Penske is a resident of Los Angeles County, California.  He is the majority owner, Chairman, Founder and CEO of Defendant Penske Media, and is also the CEO of DCP.

39.    On information and belief, Defendant Penske Media is a global media company incorporated in Delaware with its headquarters in Los Angeles, California.  Penske is the majority owner and CEO of the company.

40.    Defendant GGF is a California non-profit social welfare organization incorporated under Section 501(c)(4) of the Internal Revenue Code.

41.    On information and belief, Defendant Goeckner is a resident of Los Angeles County, California.  Goeckner is an attorney licensed to practice law in the State of California and currently serves as CEO of Defendant GGF.  He previously served as the General Counsel and COO of the HFPA.

42.    Non-party Boehly is the Co-Founder, Chairman, and CEO of Eldridge Industries, LLC, Chairman of Eldridge, and former interim CEO of the HFPA.

43.    Non-party Hoehne is the current President of Golden Globes, LLC, former President of the HFPA, and former member of the GGF Board of Directors.

44.    Non-party The Hollywood Reporter, LLC ("The Hollywood Reporter") is a Delaware limited liability corporation with its principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064.  The Hollywood Reporter publishes the website hollywoodreporter.com, which together with The Hollywood Reporter's print publication is referred to herein as "*The Hollywood Reporter*."

45.    Non-party Variety Media, LLC ("Variety") is a Delaware limited liability corporation with its headquarters and principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064.  Variety publishes the website variety.com, which together with Variety's print publication is referred to herein as "*Variety*."

46.    Non-party Deadline Hollywood, LLC ("Deadline") is a Delaware limited liability corporation with its principal place of business located at 11355 W.

Olympic Boulevard, Los Angeles, CA 90064. Deadline publishes the website deadline.com, which together with Deadline's print publication is referred to herein as "*Deadline*."

47. Non-party IndieWire Media, LLC ("IndieWire") is a Delaware limited liability corporation with its headquarters and principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Indiewire publishes the website indiewire.com, which together with Indiewire's print publication is referred to herein as "*IndieWire*."

48. Non-party Rolling Stone LLC ("Rolling Stone") is a Delaware limited liability corporation with its principal place of business located at 475 Fifth Avenue, New York, NY 10017. Rolling Stone publishes the website rollingstone.com, which together with Rolling Stone's print publication is referred to herein as "*Rolling Stone*."

49. Non-party Billboard Media, LLC ("Billboard") is a Delaware limited liability corporation with its principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Billboard publishes the website billboard.com, which together with Billboard's print publication is referred to herein as "*Billboard*."

50. On information and belief, non-party DCP is a major American television production company, headquartered in Los Angeles, California and co-owned by Penske and Eldridge. At all relevant times Boehly, through Eldridge, maintained an ownership interest in DCP, and in or around July 2022, Boehly acquired DCP outright before formally partnering with Penske Media and thereby conveying an ownership interest to Penske.

51. On information and belief, non-party MRC is an American film production company that was merged with DCP until in or around August 2022.

52. On information and belief, non-party A24 is an American film and television production company.

## STATEMENT OF FACTS

### A.    General Background

53.    The HFPA was founded in 1943 to promote education and artistry related to film and television and to use those media to establish favorable relations and cultural ties between foreign countries and the United States of America, particularly through the work and dedication of foreign journalists and photographers.

54.    The HFPA operates, at least in part, as a trade association, and its Articles of Incorporation expressly provide that among its specific purposes is the promotion of the common business interests of its members.  Those common business interests include, without limitation, promoting, facilitating, and preserving commercial journalistic opportunities for members of the foreign press.  The HFPA's other objectives include, among other things, to: (1) promote interest in the study of the arts; (2) recognize outstanding achievements by conferring annual awards; (3) advance knowledge and appreciation of drama and classical, artistic, musical and literary tradition; (4) provide and support facilities for education and instruction in the arts of motion picture and related disciplines; (5) establish favorable relations and cultural ties between foreign countries and the United States of America, by the exhibition of motion pictures and other mediums of the foreign countries in the United States of America, and the dissemination of information in the various foreign countries about the culture and traditions of the United States of America; (6) stimulate, promote and develop interest in the motion picture, television, dramatic, musical, and comedy theatre, and audio and visual recording art forms and artists throughout the United States of America and foreign countries; and (7) advance and broaden the national culture by exposing the American public to the cultures of foreign countries by the exhibition of motion pictures, television programs, dramatic, musical, and comedy theatre productions, and audio and visual recordings.

55.    The HFPA is perhaps best known for founding and running the Golden Globes, which it did for nearly 80 years until Penske and Boehly's pillaging of the HFPA through the organizations they directly and/or indirectly control—Penske Media, Eldridge, and the GGF.

**B.    The 2021 Boycott and Penske and Boehly's Opportunistic Infiltration of the HFPA**

56.    Commencing in or around February 2021, media outlets *Variety* and *The Hollywood Reporter*, directly and/or indirectly co-owned by Penske and Boehly at the time (including through Penske Media), participated in a media campaign that disparaged and criticized the HFPA and accused the organization of, among other things, lacking diversity.

57.    In response to the negative media campaign, the HFPA faced an industry-wide boycott through which key players, including film and television studios, actors, producers, publicists, and other industry stakeholders, refused to broadcast, promote, or participate in the Golden Globes or otherwise associate with the HFPA.

58.    On information and belief, Penske and Boehly directly instigated the Boycott as part of a scheme to weaken and devalue the HFPA and render it ripe for acquisition.

59.    As a result of the Boycott, the HFPA lost out on a number of media opportunities on which it had previously built its business, with the main impact being the cancellation of the broadcast of the 2022 Golden Globes award ceremony that had been scheduled to take place in January 2022.

60.    The HFPA focused on making significant organizational changes to address the concerns stoked by the negative media campaign and repair its reputation. To that end, then-HFPA President Hoehne, along with Boehly, recommended that Boehly take over as interim CEO.  The HFPA already had a relationship with Boehly

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

17

COMPLAINT

by virtue of Boehly's ownership of DCP/MRC, which was the producer of the Golden Globes at the time and received fifty percent of the Golden Globes' revenue.

61.     Some HFPA members perceived that this might create a conflict of interest in light of the fact that Boehly was known for purchasing intellectual properties at points when the properties were devalued.  Those concerns were validated when, in July 2021, Boehly (through Eldridge) made a proposal to partner with the HFPA and purchase the Golden Globes (the "Boehly Proposal").

62.     On information and belief, Boehly had directly or indirectly attempted to purchase the Golden Globes on at least two prior occasions, but those attempts had been unsuccessful.

63.     In the summer of 2021, the HFPA was making strides toward repairing the organization's reputation and ending the Boycott.  Members were endeavoring to meet with studios, some of which were encouraged to learn that the HFPA had passed new bylaws but were nevertheless waiting for the organization to announce a new full-time CEO before agreeing to meet with members to discuss a potential end to the Boycott.  Days before the HFPA was scheduled to make that announcement, Hoehne abruptly pulled the plug and told members that the HFPA would not be announcing a new full-time CEO.

64.     Instead, on September 29, 2021, Boehly became interim CEO of the HFPA.  Two days later, Hoehne asked members to cease their outreach efforts and advised that Boehly was going to take the lead on discussions with publicists, studios, and NBC.  Hoehne continued to insist that Boehly be in charge of these meetings even after companies like Warner Media expressly told her that they were uncomfortable meeting with Boehly given his significant financial interest in the Golden Globes.

65.     On information and belief, Hoehne and Boehly intentionally impeded the HFPA members' efforts to end the Boycott, with the aim of continuing to devalue the Golden Globes and inducing the members to approve an ultimate sale.  In fact,

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

18

COMPLAINT

Boehly insisted that members refrain from taking meetings with studios, publicists, and other interested parties altogether. And although Hoehne and Boehly insisted on taking the lead for these meetings, they appeared to intentionally sabotage important meetings that could have enabled the HFPA to recover and end the Boycott in time for the 2022 Golden Globes.

66. On information and belief, Hoehne expected and/or was promised a prominent role in Boehly's media empire and a significant pay increase in connection with the APA. That expectation and/or promise was ultimately fulfilled, as Hoehne currently serves as the President of Globes LLC.

**C.   Hoehne and Boehly Facilitate the Cancellation of the 2022 Golden Globes, Strip the HFPA of Any Contractual Recourse, and Raise Financial Perils to Ensure Approval of the APA**

67. As a result of Hoehne and Boehly's efforts to frustrate the HFPA's recovery, the members' efforts to end the Boycott in time for the 2022 Golden Globes were unsuccessful, and the 2022 Golden Globes broadcast was cancelled.

68. Although NBC was contractually obligated to televise the 2022 Golden Globes and would have been liable for up to $30 million for failing to do so, Hoehne and Boehly decided to release NBC from any claims for breach of contract.

69. Similarly, despite MRC's contractual obligation to produce the 2022 Golden Globes, Boehly's company refused to fulfill this commitment. Instead, Boehly, as the HFPA's CEO, negotiated a release agreement that absolved MRC—his own company—of any potential claims by the HFPA. Boehly's deceptive conduct is further demonstrated by his false assertion that he lacked a controlling interest in MRC and therefore could not compel the company to honor its contractual obligations. This claim was later contradicted by his own counsel, who admitted in an email to the AG that "Boehly had a controlling ownership interest in MRC until on or around August 5, 2022."

70.     Ultimately, Hoehne and Boehly ensured the cancellation of the 2022 Golden Globes broadcast and precluded the HFPA from seeking any financial recovery for that cancellation.  This course of conduct, as Hoehne and Boehly intended, depressed the perceived value of the HFPA's intellectual property and contributed to a general sense of financial peril at the HFPA.

71.     Hoehne and Boehly used these conditions to raise anxiety among the HFPA's Board and membership, convince them that there was an urgent need to sell the brand, and induce them to accept Boehly and Eldridge's APA.  This pressure campaign was exacerbated by the news organizations that Boehly and Penske collectively owned through their joint venture Penske Media MRC ("PMRC"), including *The Hollywood Reporter* and *Variety*, which repeatedly wrote negative articles about the HFPA.  These same news organizations would suddenly write exceedingly positive articles about the Golden Globes after the APA vote.

72.     But for the cancellation of the 2022 Golden Globes and the general panic that Hoehne, Boehly, and Penske successfully stoked concerning the HFPA's future prospects, there is a reasonable probability that the APA would never have been approved, the HFPA would have survived the brief Boycott, and the HFPA would continue to this day to own and operate the Golden Globes and maintain its ability to advance and protect the interest of foreign journalists.

**D.      Hoehne and Boehly Facilitate a Conflicted and Corrupt Negotiation and Bid Process**

73.     In November 2021, the law firm of Covington & Burling was hired to review and negotiate the Boehly Proposal on the HFPA's behalf.  In March 2022, Covington was replaced by Morgan, Lewis & Bockius ("Morgan Lewis").

74.     Although Boehly made his first proposal in July 2021, the HFPA did not seriously consider Boehly's offer to buy the Golden Globes until early 2022, after the 2022 Golden Globes broadcast was cancelled.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

75. The ensuing negotiation and bid process was marked by egregious conflicts of interest before it even began. Not only was Boehly on both sides of the proposed transaction as Chairman of the buyer and CEO of the seller, but in October 2021, just weeks after he became interim CEO, Boehly—without disclosing any conflict or obtaining Board approval—installed Alvarez & Marsel ("Alvarez"), one of his regular consulting firms, to review and purportedly audit the HFPA. On information and belief, Boehly used the information gathered by Alvarez to facilitate his negotiations with the HFPA and to further strengthen his bargaining position relative to the HFPA and other potential buyers.

76. In February 2022, Hoehne assisted in creating a special committee (the "Special Committee") that would purportedly act as independent reviewers and negotiators of purchase proposals, including Boehly's. This farce was too little, too late. Not only was the Special Committee created months after Boehly made his first proposal and had been acting as interim CEO—giving him access to financial documents and information to which other prospective purchasers never had access—but a main reason behind forming the Special Committee was to exclude from the process members of the HFPA Board who were pushing back against the prospect of Boehly acquiring the Golden Globes. For months, Hoehne had been retaliating against these members by, among other things, threatening to withhold compensation, asking said members to resign, requesting that members who defied her be disinvited or not invited to events, and spreading rumors about said members.

77. The Special Committee was formed as a final means of freezing out Hoehne's and Boehly's detractors and was comprised primarily of people loyal to Boehly. Indeed, the potential candidates for the Special Committee were hand-selected by Hoehne and Houlihan Lokey, an investment banking firm that had previously helped Boehly with a major acquisition.

78. The Special Committee consisted of Dr. Joanna Dodd Massey, Jeff Harris, Sharlette Hambrick, Hoehne, and Henry Arnaud. On information and belief,

and as evidenced by their actions during and after the proposal process, Hoehne, Harris, and Massey—constituting a majority—were exceptionally partial to Boehly's (and, indirectly, Hoehne's) interests.

79. Hoehne, Harris, and Massey were extremely combative with members of the HFPA Board, actively withheld material information from the HFPA Board and HFPA members, made knowing misrepresentations to HFPA members, and concealed material facts from HFPA members in order to induce them to vote in favor of the APA.

80. Hoehne acknowledged her conflict of interest with respect to the APA and the bid process when she willingly transitioned her role on the Special Committee to a non-voting role. Notwithstanding that purported transition, Hoehne regularly influenced, interfered with, and manipulated the bid process.

**E.    Hoehne and Boehly Obstruct Other Suitors and Hoehne Campaigns for the APA**

81. Notwithstanding her position on the purportedly independent Special Committee, Hoehne went to great lengths to support Boehly's efforts to purchase the Golden Globes, including by arranging private meetings between Boehly and HFPA members, attempting to manipulate HFPA Board seats and Board elections to ensure that Boehly's proposal obtained Board approval, and constantly averring that Boehly's deal was the only viable option for the HFPA.

82. Hoehne also obstructed the efforts of other potential purchasers by barring them from presenting offers to the HFPA Board or its members, actively disparaging one potential purchaser—Pacific Coast Entertainment ("PCE")—and sabotaging a meeting with PCE.

83. In a markedly egregious display of improper interference—and despite claims that Boehly would not interfere with competing bids—Boehly and Eldridge's attorney opined to Morgan Lewis on how PCE's bid should be presented to HFPA members. After seeing the initial draft of the letter that would present the bid to

HFPA members, the Eldridge attorney advised that the letter should "go further and say something stronger about how the proposal doesn't make sense, doesn't work and wouldn't be approved by the CA Attorney General."

84.    The Special Committee members loyal to Boehly were also obstructive of PCE's efforts.  For example, when Board members inquired about the PCE proposal, Harris responded that he did not have to tell them anything and refused to update the Board.

85.    Making matters worse, in or around May 2022, Hoehne and the Special Committee constructed an entirely unfair sham process whereby potential bidders other than Eldridge would have only two weeks to review hundreds of documents in a data room and prepare a final proposal.  Even the HFPA's financial advisor at the time, Houlihan Lokey—which was generally favorable to Boehly—admonished Hoehne that such an unreasonable timeline was "incredibly aggressive."  Morgan Lewis similarly advised Hoehne that "a go shop open period [the period to solicit higher bids] is typically 1-2 months" and that "one could argue that Eldridge had many months to make his proposal and that it is not a true go shop if others are permitted just a few weeks."  Morgan Lewis added that "[i]f this deal is challenged post-closing, *an easy argument would be that the go shop was not in fact a real go shop if a reasonable amount of time is not given to others*" (emphasis added).  But Hoehne nonetheless insisted on the improperly accelerated timeline because, on information and belief, both she and Boehly were concerned that a new Board might get voted into office before the HFPA members voted on the APA, and that new Board might not approve the APA (although Hoehne was actively attempting to interfere in and influence that potential election process as well).

86.    In fact, on May 2, 2022, Boehly himself sent an email to Hoehne, Morgan Lewis, Houlihan Lokey, Eldridge employees, and Eldridge's outside counsel, instructing that everything needed to be done "by July 15th so we have some slippage in the schedule as we can't have this slip into September as that [sic] when

new HFPA elections have to happen so we have to be done with room to spare against that hard stop date."

87.   Hoehne and the Special Committee were aware that although PCE made an offer, PCE's primary concern—and the reason for certain contingencies in its offer—was a lack of transparency with respect to the HFPA's most valuable asset, the Golden Globes.  Specifically, PCE repeatedly asked for information with respect to the status of negotiations with NBC (the network that aired the Golden Globes) and whether DCP/MRC would have any objections to the transaction.  Hoehne and the Special Committee refused to provide that information, and PCE's efforts to obtain satisfactory information directly from DCP/MRC were unsuccessful.

88.   PCE questioned how any bidder could make a competitive offer without this crucial information concerning the HFPA's most valuable asset.  Hoehne claimed—and falsely represented to HFPA members—that all bidders had access to the same materials.  That of course ignores the fact that Boehly, as interim CEO and the only person permitted to negotiate with NBC on behalf of the HFPA, was uniquely positioned to know the status of the NBC negotiations, and as a controlling owner of DCP/MRC had complete insight as to how those companies would fit into a transaction.

89.   On June 24, 2022, PCE asked DCP for a meeting in a further attempt to understand the status of the NBC negotiations and their impact on a potential acquisition.  DCP denied PCE's request to meet, and two weeks later, it was announced that Boehly was buying DCP outright.  Thus, although Boehly was ostensibly uninvolved in the HFPA's evaluation process, the pervasive and far-reaching nature of his conflicts enabled him to restrain the bid process and obtain unfair advantages vis-à-vis other potential purchasers in myriad ways.

90.   Hoehne and the Special Committee did not disclose to HFPA members that Boehly was using his interest in DCP/MRC to obstruct the bid process and obtain additional leverage.  Instead, Hoehne and the Special Committee presented PCE's

offer to the membership as one contingent on obtaining a broadcast deal but failed to disclose that the reason for the contingency was the fact that Boehly's DCP/MRC would not cooperate with PCE.

91.   As a result, when the HFPA members voted to ratify the APA, that vote was not based on duly informed consent and was instead based on material misrepresentations and omissions, including on the part of Hoehne and Boehly, who owed fiduciary duties to the HFPA and its members.

92.   Ultimately, the APA ballot offered the Eldridge proposal as the only option for the HFPA members to select, even though the HFPA had received two other bona fide offers—one from PCE and the other from Appleby Ventures, LLC and Society One, Inc. (collectively, "Appleby").

93.   Notably, PCE expressed that its offer would not require the HFPA to dissolve, and Appleby's offer may have been significantly higher than Eldridge's offer.  Specifically, two weeks before the vote, Morgan Lewis advised Hoehne and the Special Committee that an individual "called [Houlihan Lokey] and indicated they were prepared to financially back Appleby, and make an offer that is 'multiples' greater than what Eldridge offered."  Hoehne and the Special Committee never fully explored this opportunity or disclosed it to the HFPA members.

94.   Hoehne also declined to afford the HFPA members an adequate opportunity to review the APA.  Specifically, members had less than ten days to review and ratify the 400-plus page APA, were not permitted to print, copy, or download the APA and were instead required to review the lengthy document on an electronic portal that frequently timed out during review.  Furthermore, Hoehne was well aware that English is not the first language of the majority of HFPA members and that this circumstance made understanding the dense APA extremely difficult.

95.   Ultimately, members received only limited access to the APA and were effectively precluded from consulting outside counsel before voting for the proposal. The APA was uploaded to a website (Datasite), and members had to agree to the

following language: "I will not attempt to download, scan, copy, print, screenshot or otherwise capture any of the information contained on the site, except that I may view as indicated by the site index. I will not attempt to circumvent any of the security features of the site and will not enable or allow others to access the site using my authorization to the site."

96.     Hoehne declined to provide the members with more time to review the APA, even when she was expressly advised by the HFPA's counsel **on multiple occasions** that it would be prudent to do so. Specifically, on July 9, 2022, Morgan Lewis acknowledged that Eldridge's offer was "low" and that the voting timeline was inadequate. To that end, Morgan Lewis sent an email to Hoehne and the other members of the Special Committee noting serious legal and ethical concerns regarding having the vote (1) without members having seen a valuation or fairness opinion, as "[t]here will remain risk that a [m]ember will later argue they would have voted differently had they seen that the price was on the low end of Houlihan's valuation," and (2) without providing to the members all pertinent drafts and information. With respect to the latter, Morgan Lewis noted that on Hoehne and Boehly's hurried timeline, they would not have drafts of all relevant agreements prepared before the vote, and that that could form the basis for a member to "claim that they were not timely provided all requisite information and they were therefore not able to make an informed vote." Morgan Lewis went on to note that the "constant complaint [of the members] is lack of transparency" and that they would "be able to provide this important transparency—and provide information with sufficient time to members to reasonably consider it, including key deal terms and a fairness opinion—if the HFPA delays member disclosure and vote for a short time." Hoehne and the Special Committee ignored this advice from the HFPA's own counsel.

97.     Then, on July 14, 2022, an HFPA member sent an email with the subject line "MORE TIME IS NEEDED," expressly asking for members to be given one month to review the proposed transaction. Hoehne forwarded the email to the

Kasowitz LLP
Attorneys at Law
Los Angeles

26

COMPLAINT

HFPA's counsel at Morgan Lewis, who advised Hoehne that the request was "not unreasonable," that failure to comply with the request would likely become the subject of scrutiny if the APA were ever challenged, and that Hoehne should "please consider [an] extension." But, as discussed above, Hoehne's self-interest—and Boehly's express instructions to her—called for expediting the vote before any potential change to the HFPA Board, and accordingly she denied the request and chose instead to use the fact that the member who made the request for more time had inadvertently copied non-HFPA personnel on the email as a pretext to discipline and humiliate that member. Of course, that conduct had the intended effect of deterring other members from requesting additional time to review the APA.

98. Thus, not only did Morgan Lewis advise that Boehly's price was low, it further advised that the proposed timeline was rushed and did not provide sufficient time for members to reasonably consider the APA, including because members were being asked to vote on agreements that had not even been drafted yet. Morgan Lewis repeatedly advised Hoehne and the Special Committee to that effect, but Hoehne ignored Morgan Lewis's concerns and never disclosed this material information to the members or even to the rest of the HFPA Board. Instead, Hoehne proceeded to do Boehly's bidding and to press forward with the accelerated timeline.

99. Arnaud, as a signatory to the APA on the HFPA's behalf, was not even given the APA before signing and instead received only the first and last pages, notwithstanding his repeated requests to see the entire document. Arnaud waited approximately two weeks before signing the document and finally acquiesced only after his requests for access to the entire document were repeatedly denied.

100. In light of the fact that the HFPA members' ability to retain independent counsel was severely frustrated and effectively blocked, as well as their language difficulties and lack of facility and experience reviewing legal documents, members relied on the explanations provided by their President Hoehne, their interim CEO Boehly, their General Counsel Goeckner, and the Special Committee.

101.    Prior to the membership vote, from July 13, 2022 through July 22, 2022, Boehly, Hoehne, and the Special Committee hosted several meetings with the HFPA members to discuss the terms of the final proposal.  In these meetings, members who accepted employment in the new LLC that would be formed to own the Golden Globes ("Newco," later Globes LLC) were promised, at minimum: (1) guaranteed five-year employment for $75,000/year, which was anticipated to last longer than five years so long as members performed their obligations and remained in good standing; (2) health, dental, and retirement benefits; and (3) severance pay, which was promised to equal "the Eligible Member's base pay for the remaining portion of the five-year employment term."

102.    Additionally, all HFPA members were promised, **whether or not they accepted employment with Newco**, lifetime rights to: (1) nominate and vote for the Golden Globes; (2) travel to at least three film festivals and junkets per year pursuant to an annual travel budget of $2 million; (3) attend press conference opportunities; (4) vote on Advisory Board members (*i.e.*, the board that Eldridge promised would be formed to assist with the management of the new for-profit entity) and Credential Committee members (*i.e.*, the committee that would review member credentials and re-accredit the membership); (5) lifetime tickets to the Gloden Globes ceremony; and (6) lifetime membership with the GGF.  During one of these meetings held on or about July 19, 2022, Goeckner expressly stated that membership in the GGF was not contingent on employment with Newco.

103.    Hoehne, Boehly, Goeckner, and members of the Special Committee each confirmed these promises to the members multiple times over, and the promises were critical to securing sufficient votes in favor of the APA.

104.    Although these material promises conferred rights on individual members, they were also made to the organization as a whole, as the HFPA's "specific purpose," under its Articles of Incorporation and California law, is to "promote the common business interests of its members."  A fundamental purpose

and function of the HFPA is to provide its members, who are working press representing international outlets, with the same access to studios, networks, streamers, and film and television talent as has historically been afforded to domestic press. Given this core mission and the fact that the monetary consideration for the transaction ultimately went to the GGF, the only way the APA would benefit the HFPA was if its members retained the right to vote in the Golden Globes and remained involved in the journalistic process surrounding the awards. The HFPA would never have sold the Golden Globes without securing guarantees that its central interest in protecting and promoting foreign press access would be protected. With *every one* of Boehly and Eldridge's material promises later broken, the HFPA essentially received nothing in exchange for the sale of its most valuable asset, the Golden Globes.

105. On July 28, 2022, the HFPA membership voted to approve the APA in reliance on the promises made to them and to the HFPA, particularly given their difficulties in accessing, reading, and understanding the agreement—difficulties that were known to Hoehne, Boehly, Goeckner, and the Special Committee.

106. Eldridge proceeded unilaterally to change material terms of the APA after the members voted to approve it. For example, Eldridge changed the definition of a "Qualified HFPA Member" eligible to vote for the Golden Globes. Where Qualified HFPA Members were initially defined, in the APA version uploaded to Datasite for the members' review, as "each Current HFPA Member, so long as he or she is in good standing and is not a Critics Choice Awards voter as of the Closing," the definition was altered after the vote to exclude members who refused to accept employment at Boehly and Penske's new for-profit entity.

107. Eldridge also later included attachments that were not present in the original agreement, which further changed material terms. For example, the LLC agreement attached to the version of the APA that was ultimately signed in 2022 required that members had to accept employment at Eldridge to be included in the

Golden Globes Association (the predecessor to the GGF).  This further tied Golden Globe voting rights to employment at Eldridge, contrary to the promises made to members before the vote.

### F.    The Aftermath of the APA

108.   Ultimately, the promises that were made to induce member ratification were materially altered or outright ignored.

109.   To facilitate this bait-and-switch, the APA's promise of employment was entirely dependent on a take-it-or-leave-it employment agreement that Boehly and Eldridge unilaterally drafted and circulated *after* the execution of the APA.  The first time that members received the official employment offer was on November 23, 2022, nearly four months after the APA vote occurred.

110.   After Morgan Lewis advised members that it could not provide advice in connection with the employment agreement, a few members retained outside counsel, but Eldridge engaged in bad-faith negotiation tactics and failed to send to that outside counsel several material documents relating to the terms of the employment agreement, including: (1) the employee handbook; (2) the travel policy; (3) the code of conduct; (4) Eldridge Globes LLC's LLC agreement; and (5) the LLC Agreement for Eldridge Globes Aggregator LLC, the holding company that was set up to facilitate the transaction and given broad authority to engage in any and all activities necessary to do so.

111.   Initially, members had less than three weeks to review and accept the employment agreements.  When members pushed back, only a two-week extension was granted, notwithstanding the fact that material policies referenced in the agreement were not made available to the members.  As such, members became skeptical as to whether Boehly would keep his promises, and Hoehne again reassured them, even stating in a text message to one member, "Todd will keep his word."  Ultimately, the purported five-year employment "guarantee" was a lie.  Under the employment agreement, members could be terminated prior to the end of the five-

year term and would only be entitled to a three-year severance. This directly contradicted the promises made to the members before the APA vote, which stated that severance payments would be made for the full five years.

112. The promise that members would be reimbursed for three film festivals per year was also a lie. The employment agreement stated that "[t]he Company will reimburse reasonable travel and business expenses in accordance with the Company's Travel Policy…. Travel budgets must be pre-approved by the Company and expense reports must be timely submitted as described in the Company's Travel Policy." However, this policy was never provided to the members before the deadline to sign the employment offer. In an FAQ sent to members on December 13, 2022, Eldridge told members that it would "do [its] best to make the Company's go-forward travel policy … available to you in advance of the December 20 response deadline [but] these policies and requirements will be similar in form and substance to the HFPA's existing policies and requirements." Despite this, members were required to sign the offers even if the policy was not released before the deadline, which it was not.

113. Of course, the travel policy eventually released was not "similar in form and substance" to the HFPA's. Many members have attempted to get approval to go to different film festivals and have been, for the most part, ignored. To date, only a few of the members have been able to attend a film festival. Further, the travel budget was pledged to all members, whether or not they accepted employment at Eldridge. However, given that those who accepted the employment offer were denied, it is exceedingly unlikely that those who refused to sign would ever be approved or reimbursed.

114. Eldridge also failed to abide by its promises regarding lifetime voting and Golden Globes attendance. Instead, Eldridge has instituted conditions that do not confer lifetime rights and has averred that it never made any promise of attendance rights.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

31

COMPLAINT

115. As stated above, without voting rights and access to the awards for HFPA members, the APA conferred no benefit on the HFPA, as all monetary consideration would ultimately go to the GGF.

**G.    The Amendment and Misrepresentations to the Attorney General**

116. Because the HFPA held assets in a charitable trust, and because the APA created the GGF as the new charitable arm to replace the charitable trust formerly associated with the HFPA, the APA could not be approved unless the AG reviewed the transaction, deemed it to be in line with California's strict requirements and public policies concerning charitable organizations, and waived any objections.

117. When the AG did not immediately provide the waiver, Boehly, Hoehne, and Goeckner sought to amend the APA to allow Eldridge to take all of the profits from the 2023 Golden Globes (the "Amendment"), notwithstanding that the APA as voted on and approved by the members entitled Eldridge to Golden Globes profits only *after* the transaction closed. This material change to the APA—and, by extension, to the assets of the HFPA—resulted in Eldridge retaining $27,508,009.06 in connection with the 2023 Golden Globes that, according to the terms of the APA voted on by the members, belonged to the HFPA.

118. The Amendment is dated as of November 9, 2022 and was voted on by the Board at a meeting on that date. Whereas HFPA Board members were usually presented with important materials that they would be voting on at least one day in advance of any meeting, Goeckner did not present this Amendment to the Board until ten minutes *after* the meeting had started. It was also not listed on the agenda for the meeting (other than a vague reference to "Eldridge Transaction Update") and was allotted only five minutes to discuss. There was no indication in advance of the meeting, and no explanation made by Goeckner or anyone else at the meeting, that the Amendment could result in the HFPA gifting away tens of millions of dollars when it had no obligation to, while receiving nothing of value in return.

119.   Furthermore, the Amendment was never presented to or ratified by the HFPA membership.  The Amendment is therefore invalid and of no legal effect, as the California Corporations Code mandates that material amendments to contracts affecting a corporation's fundamental rights and obligations require the approval of the corporation's members.  *See* Cal. Corp. Code § 7911.  This means that the $27,508,009.06 withheld by Eldridge for the pre-closing 2023 Golden Globes rightfully belongs to the HFPA, and Eldridge retained that amount in violation of California law.

120.   The substantive unconscionability of the Amendment is made readily apparent by the fact that Eldridge refused to reimburse the HFPA for the $1.2 million the HFPA spent to produce the 2023 Golden Globes.  Thus, through the invalid Amendment, Eldridge effectively retained all the profit from the 2023 Globes while forcing the HFPA to foot the bill for the expenses.  Adding insult to injury, more than $700,000 of those production costs went to entities that Boehly either owned or had a financial interest in.

121.   Multiple representations were made to the AG that $48 million from the APA proceeds would be paid by Eldridge to the charitable foundation GGF, even after the Amendment cut that number by more than half.  These representations were material to the AG's ultimate waiver of objection.  On May 17, 2023, when—six months after the illegitimate Amendment was purportedly approved—the AG advised that it would not object to the APA, the AG wrote to Morgan Lewis, stating, "[w]ith regard to the charitable trust assets you are seeking to transfer, we have reviewed the information you provided, ***including the representation that Hollywood Foreign Press Association (HFPA) expects that at least $44 million of the $48 million it will receive from the transaction will be transferred to the new Golden Globes Foundation*** upon the dissolution of the HFPA" (emphasis added).

122.   Notwithstanding the foregoing, in a letter to Morgan Lewis dated March 27, 2025, the AG declined to approve dissolution of the HFPA due to the failure to

"document[] that the parties fully complied with the terms of the APA with respect to the amounts HFPA was to receive/retain and then transfer to the GGF" and failure to provide "all complaints HFPA received related to the transaction." In that same letter, the AG also sought explanation as to why Eldridge retained the profits for the 2023 Golden Globes but did not pay the costs.

123. On May 29, 2025, the HFPA Board voted to pause the wind-down and dissolution process, until further notice, to fulfill the organization's duty to investigate the malfeasance and conflicts of interest that were raised in myriad complaints lodged in connection with the APA.

**H.    Penske Surfaces and Assumes Control of the Golden Globes**

124. Meanwhile, shortly after the Board passed the Amendment, Boehly at last publicly announced that he was partnering with Penske to carry out the APA. Specifically, in or around January 2023, Penske and Boehly combined their businesses to form Penske Media Eldridge, which then acquired DCP, and DCP immediately thereafter assumed control of the Golden Globes—with Penske in charge of its operations.

125. On information and belief, Boehly and Penske were planning to do this all along. Although their collusion was covert, a close look at the timeline reveals their scheme. As discussed above, Boehly and Penske had an extensive business relationship pre-dating the APA, and in or around early 2021, their news companies, including *Variety* and *The Hollywood Reporter,* which were jointly owned through PMRC, participated in the campaign to disparage the HFPA and stoke the Boycott against the organization. According to a presentation deck dated January 17, 2022 prepared by Boehly's consulting firm Alavarez, Alvarez had by that time already "reached out to Penske to explore potential licensing opportunities." And in or around March 2022, while Hoehne was arranging exclusive events at which Boehly could lobby HFPA members in connection with his proposal, Hoehne began leading multiple efforts to partner with Penske.

126.   First, Hoehne led efforts to partner with Penske's then newly acquired American Film Pavilion during the 2022 Cannes Film Festival, explaining that she had spoken with the President of Penske's *Deadline* about "the potential of changing the name to the American Pavilion Presented by the Golden Globes." Concurrently, Hoehne spearheaded another initiative to partner with Penske's *Variety* to co-host a joint reception at the Hotel Barriere Le Majestic during the same festival. The coordination between Boehly, Penske, and Hoehne is further evidenced by the fact that, during that Cannes Festival, Hoehne arranged exclusive meetings between Boehly and HFPA members at this same hotel.

127.   Through these efforts and acts of malfeasance, Penske and Boehly obtained the HFPA's prized intellectual property for an unconscionable bargain in connection with a deal that deprived a charity of more than $25 million. Penske's involvement in the transaction was never disclosed to the members before the vote, despite it obviously being material to the APA.

### I.   Goeckner Fraudulently Induces the Unlawful Transfer of Assets to the GGF

128.   Boehly structured the APA such that it required the HFPA to dissolve and transfer all of its assets to the GGF upon dissolution, which as discussed above required final approval from the AG that the AG has to date declined to provide.

129.   Nevertheless, in 2024, Hoehne—who was still the HFPA's President—and Goeckner—who was still HFPA's General Counsel and COO—led initiatives to hastily and prematurely transfer the HFPA's assets in an effort to secure their employment with the Penske Trust and cripple the HFPA before their and others' malfeasance in connection with the APA could be brought to light. (As used herein, "Penske Trust" refers to Penske Media, all of its subsidiaries, and any and all partners of Penske Media that operate under the control of, at the direction of, or in collusion with Penske and Penske Media.)

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

130.   Goeckner was slated to become GGF's CEO on July 1, 2024, and as discussed above, Hoehne would become President of Penske and Boehly's new for-profit entity (later Globes LLC).  But Hoehne and Goeckner both faced significant legal exposure for their blatant breaches of their fiduciary duties and Goeckner's legal malpractice in connection with the APA, including as evidenced by multiple complaints that had already been lodged regarding the APA and the fact that the AG had declined to approve dissolution unless and until it could review those complaints. Given this vulnerability, both Hoehne and Goeckner had compelling incentives to expedite the complete transfer of HFPA assets to GGF and to ensure that the HFPA emerged from the transition as institutionally and financially weakened as possible, thereby limiting the HFPA's capacity to pursue legal recourse against them once they departed and relinquished organizational control.  Hoehne also repeatedly told HFPA Board members that Penske was pressuring her to transfer all HFPA assets to the GGF immediately and that she was concerned about upsetting Penske if the assets were not immediately transferred.

131.   Immediately after members voted to approve the APA, Hoehne stopped showing up to the HFPA offices during business hours and would only visit the offices in the evenings to meet privately with Goeckner.  On information and belief, during this time Goeckner and Hoehne were conspiring to destroy the HFPA.

132.   In January 2024, Goeckner and Hoehne almost succeeded in fully depleting the HFPA's assets when the HFPA Board, under the leadership and guidance of Goeckner and Hoehne, passed a resolution approving the transfer of nearly all remaining HFPA assets to the GGF.  But in that same resolution, the HFPA Board also voted to hold back a $5 million Reserve to allow the HFPA to continue its operations and fulfill all legal obligations prior to its dissolution (the "Reserve Resolution").

133.   The Reserve Resolution ultimately culminated in the June 27, 2024 Assignment whereby the HFPA assigned nearly all of its assets, rights, and liabilities

to the GGF.

134. Goeckner participated in drafting and negotiating the Assignment between the HFPA and the GGF in his capacity as HFPA's General Counsel, notwithstanding the fact that he was directly conflicted given his then-impending role as the GGF's CEO. In fact, on information and belief, Goeckner was the principal drafter of the Assignment for *both* the GGF and the HFPA and essentially negotiated with himself. Goeckner even signed the Assignment on the GGF's behalf despite having purportedly drafted and negotiated it on the HFPA's behalf.

135. The recitals in the Assignment expressly acknowledge that the Assignment was entered into pursuant to—and as a byproduct of—the APA. And in accordance with the Reserve Resolution, the Assignment provided that the HFPA could retain funds that were "reasonably necessary or desirable to effectuate [] winding up and dissolution" and hold those funds (*i.e.,* the Reserve) "until its dissolution."

136. However, between the passing of the Reserve Resolution and the execution of the Assignment, Goeckner surreptitiously took calculated steps that would facilitate his efforts to deplete the Reserve *after* he left the HFPA.

137. Specifically, on June 26, 2024—the day before the Assignment was executed and four days before Goeckner left the HFPA to officially start his position as the GGF's CEO—Goeckner led an executive session during an HFPA Board meeting wherein the Board passed a resolution initiating the transfer of assets to the GGF pursuant to the Assignment (the "June 2024 Resolution"). Goeckner, who drafted the June 2024 Resolution, buried in it a provision purporting to allow any HFPA officer to unilaterally transfer funds to the GGF without the Board's approval. Goeckner would later invoke this resolution to justify fraudulently inducing the HFPA Treasurer to deplete the Reserve, and thereafter to threaten and deter GGF members who were pushing to return the funds to the HFPA.

138. However, Goeckner's backdoor provision did not actually permit depletion of the Reserve; it merely created an illusion of legitimate authority that would make it easier for him to induce illicit transfers. Because the Reserve was instituted via Board resolution and was to be held indefinitely, HFPA bylaws mandated that "specific advance authorization by the Board of Directors" was required before the Reserve could be depleted, but the HFPA Board never adopted such a resolution. Although the June 2024 Resolution authorized officers to initiate transfers *pursuant to the Assignment*, it did not rescind, satisfy, circumvent, amend, or even address the Reserve Resolution. To this day, there has never been a Board resolution to reduce the Reserve. Because such authorization never existed, any depletion of the Reserve was impermissible.

139. Notwithstanding the foregoing, less than one month after leaving the HFPA, Goeckner fraudulently induced the HFPA's Treasurer to transfer approximately $4 million from the Reserve to the GGF.

140. On July 29, 2024, Goeckner sent an email to the Treasurer instructing the Treasurer to transfer $3 million to the GGF from the HFPA Reserve funds (the "July 29 Email"). At that time, Goeckner was serving as CEO of the GGF, and Goeckner and the Treasurer were working in the same office space. After Goeckner sent the July 29 Email, the Treasurer had a conversation in the office with Goeckner and asked if they needed Board approval to make the transfer. Goeckner responded by telling the Treasurer that Board approval was *not* required. Goeckner's statement was false, as HFPA bylaws expressly provide that specific Board approval *was* needed to draw down the Reserve. On information and belief, Goeckner knew this statement was false when he made it, including because as the former General Counsel of the HFPA he was thoroughly familiar with the HFPA bylaws and knew that depleting the Reserve would be a violation of those bylaws. Goeckner made this misrepresentation to the Treasurer with the intent of inducing the Treasurer to unlawfully transfer the funds to the GGF.

141.   As part of his effort to induce the unlawful transfer and retain an ability to meddle in HFPA affairs, Goeckner told the Treasurer in or around July 2024 that although he was no longer serving as HFPA General Counsel or COO, he retained an "advisor" role that purportedly authorized him to instruct the Treasurer on behalf of the HFPA.  That statement was also a lie, and Goeckner knew it was false when he made it, because Goeckner never retained such a position and it was never authorized by the Board.  Indeed, Goeckner has since admitted as much to the HFPA.

142.   Goeckner used his status as a lawyer and the HFPA's former General Counsel to also convince the HFPA Board members—none of whom is a lawyer, and all of whom trusted and reasonably relied on Goeckner's representations given his superior legal knowledge and prior role as the HFPA's General Counsel—that although he had become the CEO of the GGF and was no longer an HFPA officer, he retained an advisory role to the HFPA Board.  Goeckner then used that fictitious status to insert himself into meetings and the HFPA's affairs long after he was lawfully entitled to do so.

143.   In reliance on Goeckner's misrepresentations, the Treasurer transferred $3 million pursuant to Goeckner's instructions to divide that sum across six transfers: $500,000 on or around July 30, 2024; $500,000 on or around July 31, 2024; $500,000 on or around August 1, 2024; $500,000 on or around August 2, 2024; $500,000 on or around August 5, 2024; and $500,000 on or around August 6, 2024.

144.   At or around the same time, Goeckner also fraudulently induced the Treasurer to further deplete the Reserve by transferring an additional sum of approximately $1 million to the GGF for purported payment of HFPA obligations to law firms and other expenses.  On each occasion, Goeckner told the Treasurer that these transfers were authorized.  Those statements were false, and Goeckner knew they were false when he made them, including because he knew those liabilities had already been assumed by the GGF under the Assignment and thus were not the HFPA's responsibility.

**J.     Goeckner Threatens GGF Board Members, Blocks Efforts to Return the Unlawfully Transferred Funds, and Colludes with the Penske Trust to Cripple the HFPA**

145.   In the summer of 2025, the HFPA retained counsel to investigate potential improprieties in connection with the APA, including, but not limited to, those referenced above.

146.   The very next day, Globes LLC initiated a confidential matter (the "Confidential Matter") concerning the HFPA and the APA.  On information and belief, a primary motivation for the Confidential Matter was to inhibit the HFPA's ability to thoroughly investigate malfeasance in connection with the APA and force the organization to dissolve before any such investigation could be conducted.

147.   On information and belief, Goeckner and the GGF are aligned with Boehly, Penske, and Globes LLC in connection with the Confidential Matter and are colluding with them to secure an advantage against the HFPA.  Notwithstanding the private nature of the Confidential Matter, Globes LLC's counsel has impermissibly shared with Goeckner and the GGF confidential materials relating to that matter.  In September 2025, Globes LLC sent a letter to the GGF demanding that the GGF certify that it would not fund the HFPA in the Confidential Matter (despite the GGF's obligation to do so pursuant to the Assignment).  On information and belief, Globes LLC's demand for such assurance was part of a quid-pro-quo in which Globes LLC is refusing to let the GGF use the Golden Globes intellectual property Globes LLC obtained through the APA (including by retaining the name "Golden Globes Foundation") unless the GGF supports and cooperates with Globes LLC's efforts against the HFPA.  On information and belief, Globes LLC, Boehly, and Penske are actively lobbying and attempting to bribe GGF Board members in an attempt to obtain written certifications from the GGF that Globes LLC can use against the HFPA in the Confidential Matter, including by inviting GGF Board members to attend private meetings at Penske's personal residence and offering them extended

Golden Globes voting rights and ballroom seats for the awards ceremony if they will (falsely) assert that all HFPA claims have been assigned to the GGF and sign waivers purporting to release those claims, and/or if they can induce the HFPA to dissolve.

148.　Goeckner has also taken concerted steps to obstruct the HFPA's ability to represent itself in the Confidential Matter, including by tortiously interfering with and blocking the return of the unlawfully transferred funds and refusing to return the HFPA's confidential files.

149.　Beginning in or around the summer of 2025 and continuing through the end of that year, the HFPA sent multiple letters to Goeckner and the GGF requesting return of the unlawfully transferred funds.　On information and belief, Goeckner initially unilaterally denied the HFPA's requests without even raising the issue for a GGF Board or membership vote.　However, after the HFPA sent a further letter to the GGF explaining the impropriety of the unlawful transfer and again requesting the return of the funds, the GGF Board decided to vote on the issue.　That vote stalled at 3 in favor, 3 opposed, and 3 abstentions, due in large part to Goeckner making ludicrous and legally frivolous threats to GGF Board members, claiming that they would be sued by the GGF, Penske, Boehly, and/or the AG and held personally liable if they voted to return the unlawfully transferred funds.　Not only was there no good-faith basis for such threats, but the AG's office advised the HFPA that it had never made such a representation to Goeckner or the GGF, that no one from the GGF had ever spoken to the AG about returning the funds, and that the AG's office was taking no position on the issue.

150.　Goeckner was aware that the HFPA needed the unlawfully transferred funds to be returned in order to represent itself in connection with the Confidential Matter and to complete its investigation of the circumstances surrounding the APA negotiation and vote.　On information and belief, Goeckner's intent in fraudulently inducing the unlawful transfers was to deplete the HFPA's funds as quickly as possible so as to ensure that the organization could not afford to investigate the APA,

discover his and his cohorts' improprieties, or defend itself in the Confidential Matter, and his intent in vigorously seeking to block the return of those funds was to ensure that the HFPA remained crippled in this regard. Goeckner did all of this in the interests of himself, Penske, Boehly, Hoehne and the Penske Trust, and against the interests of the HFPA.

151. Goeckner has also refused to return to the HFPA its confidential files. As the HFPA's former General Counsel, Goeckner has a professional, ethical, and fiduciary duty to return those files upon demand. Not only has he refused to do so, but he has used the HFPA's confidential information against the HFPA in fraudulently inducing unlawful transfers from the HFPA to the GGF and attempting to persuade GGF members that the unlawfully transferred funds should not be returned.

**K.    The Relevant Markets**

152. Penske, through Penske Media and related partnerships, including with Boehly, has formed and maintained an unlawful combination in restraint of trade and has monopolized, attempted to monopolize, and conspired to monopolize at least three Relevant Markets: (1) Hollywood Trade Publications; (2) Secondary Awards; and (3) Major Entertainment Award FYC advertising ("FYC Advertising").

153. Penske's covert acquisition of the Golden Globes, marked by myriad acts of malfeasance and anticompetitive conduct as set forth above, was a central step in entrenching market power by vertically integrating critical inputs and distribution channels in a manner designed to suppress competition and foreclose rivals, including by enabling Penske to control members of the foreign press and/or exclude them from market participation for the commercial benefit of his trade publications. The acquisition further strengthened Penske and Penske Media's monopoly control over Secondary Awards and FYC Advertising. The GGF was created to allow that transaction to evade regulatory scrutiny and to facilitate the dismantling of Penske's competition at the HFPA. Penske has used the GGF to unlawfully divert charitable

assets to his for-profit enterprise, exercise control over charitable resources, and weaponize the organization to undermine and destroy the HFPA. As detailed below, this conduct constitutes violations of federal and state antitrust and unfair competition laws.

### a.    The Market for Hollywood Trade Publications

154. As used herein, "Hollywood Trade Publications" refers to a relevant antitrust market consisting of certain entertainment industry publications as defined below and the entertainment media brands that disseminate those publications. These publications are widely recognized throughout the entertainment industry as a distinct category of media and serve as entertainment-industry-specific sources of news, analysis, and information for entertainment professionals, advertisers, and other stakeholders in the entertainment industry.

155. The unique characteristics of these publications, such as their focus on Hollywood studios, entertainment industry trends, and trade-specific reporting, distinguish them from general news outlets or other forms of media. They provide business-to-business news, awards coverage, and FYC platforms targeted at film, television, music, and streaming industry professionals.

156. Hollywood Trade Publications have a distinct customer base, serving as the primary source of authoritative entertainment industry trade journalism relied on by industry professionals—including studios, executives, producers, talent, lawyers, agents, and awards voters.

157. These publications are highly specialized, widely recognized periodicals that are firmly entrenched as the key industry players and that in many instances are the only effective contenders for industry-standard engagement. These publications offer a unique product marked by entertainment industry insider access; seamlessly blended comprehensive, year-round editorial coverage of awards season across print, digital, and video platforms, often enhanced by data analytics and interactive industry tools; and seamless interplay between editorial content and

entertainment-related advertising.

158. Hollywood Trade Publications operate primarily through print and online or digital products, as well as through sponsoring and/or hosting live and pre-recorded events, including marketing and promotional events.

159. Given the global reach of the entertainment industry and the digital elements of these publications, the geographic market includes worldwide consumers who rely on these publications for industry-specific information.

160. There is no meaningful substitute for Hollywood Trade Publications, and other publications are not reasonably interchangeable.

161. Penske Media, owned and operated by Penske, owns all of the major Hollywood Trade Publications. Penske has been referred to as having "absolute domination [in] the entertainment industry trades." One journalist remarked that "[t]he consolidation Penske has managed so far has given him a Charles Foster Kane-like presence in the sectors he cornered." Another journalist stated that she "couldn't remember a time in her career when Penske didn't dominate film industry news"—his trades are "where the film community gets industry news, production news, it's the websites and the publications we use to stay abreast of what's happening. And these publications also set the tone when it comes to award season. Awards season … makes for a huge chunk of film-related journalism year-round. There's a lot of money in awards coverage, obviously, in terms of advertising and sales."

162. The extent of Penske's market control has reached such levels that even editorial hiring choices have become essentially meaningless—a reality explicitly acknowledged by industry commentary, including one article that noted "[i]t doesn't matter that much whether the top editor of [*The Hollywood Reporter*] is [a former editor of the *Los Angeles Times* or a former top editor for the Associated Press] or both. Most of the editorial competition for Hollywood trade news are the other Penske Media Corp publications located on nearby floors of Penske's Hollywood offices."

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

44

COMPLAINT

163.    Penske, through Penske Media, has been accused of anticompetitive conduct such as using non-compete agreements to hoard talent and instigating an exposé about the editor-in-chief of a competitor in 2021 around the same time that Penske participated in instigating and perpetuating the Boycott against the HFPA.

164.    The HFPA participates in the market for Hollywood Trade Publications through, among other things, (1) its membership, which consists of foreign journalists who cover Hollywood studios, entertainment trends, and awards, and (2) FYC platforms targeted at film, television, music, and streaming industry professionals.  As alleged herein, through their anticompetitive conduct, Defendants have restricted the HFPA and its members' ability to participate in this market, thereby restricting output, reducing competition, and further facilitating Penske and Penske Media's ability to extract supracompetitive prices and impose unfair market terms.

### b.    The Market for Secondary Awards

165.    As used herein, "Major Entertainment Awards" are the entertainment industry's premier awards in the United States that recognize accomplishment in film, television, music, stage, podcast, and streaming content creation.  These awards are generally recognized in two groups or submarkets.

166.    The first group or submarket of Major Entertainment Awards is colloquially referred to as the "Big Four" (or EGOT) and includes the Emmys, Grammys, Oscars, and Tonys.  A central characteristic of the Big Four Major Entertainment Awards is that they are announced during televised ceremonies that receive an average viewership of at least 5 million to 20 million viewers, creating universal recognition as the most prestigious awards in the entertainment industry. That status creates a halo effect of stature and proven excellence, which signals to the market that a recipient has a premium, de-risked brand and thereby translates directly into the highest level of award-based commercial bargaining power.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

45

COMPLAINT

167.   As a result, Big Four award recipients can immediately command higher fees.  Studies and reports indicate that Oscar winners can receive a 20% pay increase in their next film, and male Oscar winners have historically experienced an immediate 81% rise in baseline salary.  After winning a Grammy, an artist immediately commands more bargaining power with respect to royalties and creative control, and a study by Forbes found that winning a Grammy increased concert ticket sales and producer fees by at least 55% in the year following the win.  According to Forbes, an Emmy win can boost the credibility of an entire network or streaming platform, with viewership for some programs increasing by 100% or more after Emmy wins, and Emmy-winning actors often command higher salaries and in some instances have renegotiated contract increases of almost 300%.  Similarly, after winning a Tony award, an actor can see cash bonus bumps, permanent salary increases, and significantly enhanced bargaining power.  According to a study out of Yeshiva University, Tony nominations reflect not just artistic merit but real economic value, as a show's weekly revenue can go up by 20% when it features a multiple Tony-award nominee and by $100,000 to $200,000 after the show itself receives a Tony nomination.  And according to *The Hollywood Reporter* "[a] Tony award for best musical can add anywhere from six months to a year and a half to a run."

168.   The economic value of the Big Four awards is further evidenced by the fact that the entertainment industry's collective bargaining agreements regularly incorporate boilerplate escalator clauses that provide for additional compensation (bonuses) and increased residuals if a project or a performer is nominated for or wins a Big Four award.

169.   The "Secondary Awards" market consists of awards announced during televised ceremonies with an average viewership of approximately 1 million to 10 million viewers.  These include, for example, the Golden Globe Awards, Actor Awards f/k/a The Screen Actors Guild Awards, Academy of Country Music Awards, Country Music Awards, Billboard Music Awards, American Music Awards, MTV

COMPLAINT

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

Awards, Critics Choice Awards, Latin American Music Awards, BET Awards, and Streamy Awards. Secondary Awards are valued as (1) a predictive campaign tool or precursor marketing expense to increase the statistical probability of winning a Big Four award, (2) a promotional tool, and (3) a mechanism to facilitate short-term increases in commercial volume. For example, music-based Secondary Awards (such as the Billboard Music Awards and American Music Awards) trigger brief, temporary spikes in consumer transactional volume, such as a 48-hour lift in Spotify streams or physical merchandise sales; however, they do not structurally shift the underlying publishing or master recording royalty valuation minimums in distribution contracts.

170. Unlike the Big Four awards, standard Hollywood talent contracts do not feature an automatic financial escalator for winning a Secondary Award, and Secondary Awards generally do not translate to contractual leverage and cannot alter the structural baseline of a worker's minimum compensation. Because market participants such as studios and actors cannot substitute a Golden Globe or a Streamy Award to achieve the contractual, structural, or library-valuation impacts of an Oscar or an Emmy, there is zero cross-elasticity of demand between these two separate economic submarkets.

171. The Golden Globes are widely considered to be the most valuable and prestigious Secondary Award, acting as a major, high-profile precursor to the Oscars. According to Penske Media's website, the Golden Globes average about 9 million viewers and 178 million engagements across TV, digital, and social media platforms. In comparison, the Penske Media-owned Academy of Country Music Awards average approximately 7-8 million viewers and 60 million views across Penske Media-owned and operated social media accounts; the Penske Media-owned Billboard Music Awards average approximately 6-7 million viewers and 180 million engagements across TV, digital, and social media platforms; the Penske Media-owned American Music Awards average approximately 5-6 million viewers and 161

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

47

million views across Penske Media-owned and operated social media accounts; the Penske Media-owned Latin American Music Awards average approximately 5 million viewers; the Penske Media-owned Streamy Awards average approximately 15 million livestream viewers; the Actor Awards average approximately 1.5 million viewers; the Country Music Awards average approximately 6 million viewers; the MTV Awards average approximately 5-6 million viewers; the BET Awards average approximately 8 million viewers; and the Critics Choice Awards average approximately 700,000 viewers.

172. Secondary Awards are announced and distributed at high-profile ceremonies that feature A-list talent and performances. Broadcasting rights in the market for Secondary Awards are licensed to media companies for millions of dollars annually, reflecting their substantial commercial value. The ceremonies for Secondary Awards further generate significant advertising revenue, with 30-second spots commanding at least $100,000 on average.

173. All Major Entertainment Awards, including both Big Four and Secondary Awards, are a reputational and marketing credential that entertainment firms use to increase commercial performance, and market participants recognize them as a distinct competitive arena.

174. The winners of Major Entertainment Awards are determined by awards voters, usually consisting of professionals who belong to exclusive, invitation-only organizations that manage the voting and distribute the awards. Examples of such organizations include: the Academy of Motion Picture Arts and Sciences, which distributes the Oscars; the National Academy of Recording Arts & Sciences, which distributes the Grammys; the Academy of Television Arts & Sciences, which distributes the Emmys; the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA"), which distributes the Actor Awards f/k/a the Screen Actors Guild Awards; and the HFPA, which distributed the Golden Globe Awards prior to the APA. All of these entities are non-profit organizations. With

Kasowitz LLP
Attorneys at Law
Los Angeles

48

COMPLAINT

Penske's takeover of the Golden Globes, it is now the only one of the foregoing Major Entertainment Awards that is controlled by a for-profit entity.

175. The geographic market for Major Entertainment Awards, including Secondary Awards, is the United States, given that the organizations that distribute them are based in the United States and the awards ceremonies are held in the United States.

176. There is no meaningful substitute for Major Entertainment Awards, including Secondary Awards, and other awards are not reasonably interchangeable. The function of a Major Entertainment Award is not merely recognition, but a distinct form of industry-validated prestige and signaling that other awards do not replicate. Recipients, studios, networks, advertisers, and audiences do not treat non-Major Entertainment Awards as substitutes in a way that would impose competitive constraint.

177. Penske, through Penske Media, owns six of the ten Secondary Awards Shows, but through his acquisition of the Golden Globe Awards, including through his collusion with Hoehne, Boehly, Eldridge, Goeckner, and the GGF, the HFPA is informed and believes that his market share of the advertising revenue now exceeds 80% of the relevant market, as the Golden Globes are significantly more valuable than almost all of the other Secondary Awards in terms of market reach and revenue generation. Indeed, while Penske-owned Secondary Awards account for between 60-70% of Secondary Awards market viewership, they account for an even larger share of the advertising revenue due to the popularity of the Golden Globes, which historically generated roughly $42 million to more than $100 million in advertising revenue when paired with red carpet coverage.

178. As alleged herein, after acquiring control of the Golden Globes through fraud and anticompetitive conduct, Penske and Penske Media, including through their collusion with Hoehne, Boehly, Eldridge, Goeckner and the GGF, took deliberate action to exclude the HFPA and its members from participating in the

Golden Globes or the Secondary Awards market and to destroy the HFPA—conduct that is exclusionary in nature and that harms the competitive process by eliminating a market participant and restricting market alternatives.

### c.  The Market for FYC Advertising

179.  The market for FYC Advertising consists of promotional events and print advertisements strategically targeted at Major Entertainment Awards voters by studios and production companies to promote their films, television shows, and performances for awards consideration, with many of the print advertisements placed in domestic Hollywood Trade Publications.

180.  FYC advertisements are an integral component of all Major Entertainment Awards, as they are the primary means by which potential nominees gain exposure to awards voters.

181.  FYC advertisements are distinguished from general advertising by their specific purpose and audience: they are designed exclusively to influence Major Entertainment Awards voting, are targeted directly at the select group of Major Entertainment Award voters during defined periods (the respective awards seasons), and are concentrated in trade publications and digital platforms frequented by that audience.  These advertisements are not reasonably interchangeable with general advertising due to their specificity and functionality.

182.  FYC advertisements appear primarily in trade publications such as *Variety*, *The Hollywood Reporter*, and *Deadline* (collectively, the "Premier Hollywood Trades"), which, due to their industry recognition and specialized nature, are widely recognized as the three key publications for FYC advertisements.  Penske, through Penske Media, owns all of them.

183.  Penske Media has admitted in recent court filings that collectively the websites for the Premier Hollywood Trades receive over 53 million monthly page views.  On information and belief, these trades receive more than approximately 80-90% of FYC Advertising revenue and, therefore, control more than approximately

80-90% of the FYC Advertising market.

184. To the extent there is a second tier of competitors vying for FYC advertisements, that market is dominated by *Rolling Stone*, *IndieWire*, *Billboard,* and *TheWrap* (the "Secondary Hollywood Trades"). *Rolling Stone* receives approximately 12 million monthly page views, *IndieWire* receives approximately 21 million monthly page views, and *Billboard* receives approximately 12 million monthly page views. Together, these publications control the segment of the market that is not already controlled by the Premier Hollywood Trades. Penske, through Penske Media, owns all of these publications with the exception of *TheWrap*.

185. The geographic market for FYC Advertising is the United States, given that promotional FYC events take place in the United States, the Premier and Secondary Hollywood Trades in which FYC advertisements are placed are all based in the United States, and FYC advertisements target voters throughout the United States. Advertisers seeking to influence major awards campaigns cannot substitute local or regional publications for national entertainment trade platforms, as national coverage is essential to reach the nationwide constituency of industry voters and executives.

186. There is no meaningful substitute for FYC advertisements through Hollywood Trade Publications, and other advertising mediums are not reasonably interchangeable.

187. FYC Advertising is a highly specialized, intense, and lucrative niche within the broader entertainment advertising industry. With respect to film, some FYC campaigns can cost more than the film itself. Estimates show that during the 2022 Oscar season alone, **$53 million** was spent on FYC advertisements by just the top five movie studios. A full-page print FYC advertisement for an Emmy Award can cost upwards of $250,000. In music, advertisements for Major Entertainment Awards can cost upwards of $75,000 in a Premier Hollywood Trade as well as in Secondary Hollywood Trades such as *Billboard*.

188. The Premier Hollywood Trades now also offer takeover campaigns where contenders can take over one of those trades' online platforms for a period of time to run a FYC campaign across the entire platform. On information and belief, a one-day "takeover" of an entertainment trade publication like *Deadline* or *Variety* for a FYC campaign can cost between $200,000 and $600,000.

189. Penske's trade publications also host "FYC events." *Variety* produces several high-visibility FYC events, including "A Night With Artisans," the "TV FYC Fest," and "Variety Streaming Room" events, which can be bundled into larger advertiser packages that integrate print and digital advertising.

190. On information and belief, the Premier Hollywood Trades and Secondary Hollywood Trades offer 360-degree marketing strategies and campaigns for awards season that include discounted bundle opportunities targeting multiple Major Entertainment Awards across multiple trade platforms—*e.g.*, a discounted price to advertise for both the Oscars and Golden Globe Awards or to advertise on both *Deadline* and *Variety*. A bundled campaign can cost millions of dollars. In 2022, it was reported that $53 million was spent on FYC advertisements for just the Oscars that year.

191. In sum, on information and belief, the market for FYC Advertising is worth from approximately $500 million to more than $1 billion per year, and Penske, through Penske Media's ownership of the Premier Hollywood Trades and Secondary Hollywood Trades, controls more than 80% of that market.

192. As reported by *Forbes*, by "aggregat[ing] control over most of the major outlets covering the day-to-day business of Hollywood and the music business," Penske has been able to "maximize awards-season advertising revenues from networks, studios and streaming services seeking the prestige and marketing punch of Emmy, Golden Globe, and Oscar nominations and wins." As *Forbes* predicted in 2020, through Penske's acquisition of "music-industry bible Billboard and hip hop-focused Vibe next to consumer-facing Rolling Stone and Music Business

Worldwide," Penske's strategy now "extend[s] more substantially into the Grammys season as well."

193. Prior to the APA, which was brought about via the collusion of Penske and Penske Media, Boehly, Eldridge, and Hoehne, the HFPA and its members participated in the FYC Advertising market, including, but not limited to, by offering awards candidates and film studios premium opportunities to meet directly with awards voters via exclusive FYC screenings and interviews. This offered a viable alternative to advertising in Penske's Hollywood Trade Publications, and for many HFPA members, these business opportunities represented a substantial percentage of their journalistic work. Penske has now taken concerted measures to exclude the HFPA from this market.

194. Penske's consolidation of Hollywood Trade Publications leaves no effective alternatives for studios and distributors seeking to reach awards voters, effectively granting Penske and Penske Media the ability to control pricing and exclude competitors from the market for FYC Advertising. Penske's consolidation further creates significant barriers to entry for competitors, further entrenching his market power.

195. As one outlet reported, "[w]ith [his] acquisition of the Hollywood Reporter and Billboard in 2020, Penske united nearly all of the Hollywood trade publications under one roof and became the biggest player in entertainment industry news media." The report went on to refer to Penske as "a near monopolist in the lucrative business of 'For Your Consideration' awards advertising." Penske's market domination has only grown since then, leading another publication more recently to recognize that "the Penske empire is a monopoly."

**L.      The Penske Trust**

196. Penske Media owns all the major Hollywood Trade Publications, including *The Hollywood Reporter*, *Variety*, *Rolling Stone*, *Billboard*, *Vibe*, *Deadline*, and *IndieWire*.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

197. According to Penske Media's website, "*The Hollywood Reporter*'s website, Hollywoodreporter.com, has repeatedly been recognized as best in class, garnering numerous awards for its journalism. The website Hollywoodreporter.com receives more than 14.5 million average unique monthly views," over 60 million monthly video views, and according to publicly available data, approximately 30 million monthly page views.

198. Penske Media also reported that "Variety.com receives 24 million monthly average visitors and an average of over 78 million monthly pageviews." In recent court filings, Penske Media touted that even "Martin Scorsese described [*Variety*] as 'the single most formidable trade publication ever.'"

199. With respect to *Deadline*, Penske Media reports that it receives more than 49 million monthly page views and "is the authoritative source for breaking entertainment industry news."

200. As to *IndieWire*, Penske Media has stated that "*IndieWire* reports on, defines, and elevates the best of film and TV and is a go-to source for creators and consumers to discover new voices. *IndieWire* champions contenders to the awards-voting community through, among other things, year-round awards coverage and premium editorial franchises." Penske Media has acknowledged that *IndieWire's* website receives at least 21 million monthly page views.

201. Penske Media also owns *ARTNews*, *Women's Wear Daily*, *Art in America*, *Billboard Charts*, DCP, *Artforum*, SXSW, SHE Media, Vox Media and all of its publications including *Vox*, *SB Nation*, *New York Magazine*, *The Dodo*, and *The Verge*, SXSW Sydney, SXSW London, *Robb Report*, and *Dick Clark's New Year's Rockin' Eve*. Penske Media has recently admitted in court filings that Penske Media's content "engages a monthly audience of more than 120 million visitors in the United States alone."

202. As noted above, Penske Media owns numerous Secondary Awards, including the Golden Globes, the Academy of Country Music Awards, the American

Music Awards, the Billboard Music Awards, the Streamy Awards, and the Latin American Music Awards.

203. Penske Media owns Luminate Data, LLC ("Luminate"). According to Penske Media's website, "Luminate is the preeminent entertainment data and insights company, unleashing access to the most essential, objective, and trustworthy information across music, film and television, with data compiled from hundreds of verified sources. Today, the company maintains its more than 30-year legacy of accurate storytelling by powering the iconic Billboard music charts, while also acting as the premiere [sic] database for the television and film industries. Working closely with record labels, artists, studios, production companies, networks, tech companies, and more, Luminate offers the most valued source of comprehensive, independent, and foundational entertainment data that drives the entertainment industry forward."

204. Penske Media also dominates the awards show prediction market through its ownership of the awards show prediction company Gold Derby Media, LLC ("Gold Derby"). According to Penske Media's website, "Gold Derby is the original awards show authority, tracking the most competitive races in entertainment with predictions, analysis and news, including Academy Awards, Emmys, Golden Globes, Grammys, Tonys, and more. Gold Derby compiles predictions from the industry's top awards pundits alongside editors and users to ensure the highest degree of accuracy for nominations and wins."

205. On information and belief, in 2020, Boehly and Penske combined publishing elements of their respective business into a joint venture referred to as PMRC.

206. On information and belief, at all relevant times, PMRC owned *Variety* and *The Hollywood Reporter*.

207. Penske, through his partnership with Eldridge Industries, has ownership interests in the film and TV production companies A24, MRC, and Fulwell Entertainment.

208.   In or around January 2023, Penske and Boehly combined Penske Media and Eldridge to form Penske Media Eldridge.

209.   Penske Media Eldridge orchestrated the formation of the GGF for the purpose of securing regulatory approval for the APA, and has thereafter engaged in collusive and illicit conduct with the GGF and its CEO Goeckner to promote the interests of the Penske Trust and to unlawfully use non-profit funds and resources for commercial gain.

210.   Penske and Boehly, acting in concert through their network of controlled business entities described herein, have created and operated an integrated enterprise that functions as an unlawful trust designed to monopolize and manipulate critical sectors of the entertainment industry, including awards shows, trade publications, FYC advertising, industry data services, and content promotion markets.

**M.    The Penske Trust Turns the Golden Globe Awards into a Pay-to-Play Racket and Engages in Further Anticompetitive Conduct and Unfair Trade Practices**

211.   Although Boehly originally told the media his plan for revamping the HFPA was to promote transparency and integrity in the Golden Globes, Penske, after taking charge of the Golden Globes, almost immediately began turning them into a pay-to-play platform to advance his and Boehly's profiteering schemes.

212.   The *Los Angeles Times* recently reported that "today's for-profit Globes may well be worse than ever, crossing the line in ways that are more egregious" than the allegations that hindered the HFPA in 2021.

213.   On information and belief, in or around September 2024, the Penske Trust, via its trade publication *Variety*, launched the "Variety Golden Globes salon dinner series," whereby it sold exorbitantly priced dinners that offered access to Golden Globes voters.  According to media reports, the dinners cost $70,000 apiece.

214.  On information and belief, the Penske Trust began charging potential movie studios a $5,000-per-project "administration fee" to have a project placed on the Golden Globes Screening Platform, and studios that submitted at least 14 titles were offered better display treatment on the portal.

215.  On information and belief, the Penske Trust offered Golden Globes tickets for $70,000 each via a "concierge gift guide" in its luxury lifestyle magazine *Robb Report*.

216.  In or around May 2025, the Penske Trust launched one of its more brazen pay-to-play schemes with the announcement of a new "Best Podcast" category being added to the Golden Globes.  In October 2025, the Golden Globes announced that 25 podcasts were "eligible" for the award.  That eligibility was determined by Luminate—the Penske Trust's entertainment data and insights company.  On information and belief, through Luminate the Penske Trust made popularity and financial resources core criterion for eligibility.  The Penske Trust did this to create an unlawful barrier to entry so that only contestants who could afford to purchase Major Entertainment Award FYC advertisements from the Penske Trust would be eligible for the award.

217.  As the *Los Angeles Times* reported, "the real motivation behind the podcast category became apparent soon after [the 25 eligible podcasts were announced]: money."  Specifically, "Variety had its sales team pitch nominated podcasts an array of paid marketing partnerships, including a $25,000 buy to become a Podcasting FYC Fest supporting partner and a $75,000 deal for the podcaster to be given the Variety Creative Impact Award in Podcasting."  In contrast, when the HFPA offered in-person FYC events, the studios only paid to reserve the space, as the primary benefit to the HFPA was the exclusive access to its members from which they derived their journalistic content.  When Penske took over, not only did he deprive the HFPA of that access, but he began charging the exorbitant prices referenced above, which represent an exponential price increase.  Charging these

supracompetitive prices was one of the primary goals of Penske and Boehly's anticompetitive conduct.

218.   Penske trade publications including *Variety*, *The Hollywood Reporter*, and *Deadline* all sold the podcast FYC packages.

219.   *Gold Derby*, the Penske Trust's award predictions website, also participated in the podcast FYC racket by selling paid video interviews to eligible contestants.

220.   As discussed above, the Penske Trust has a complete monopoly on the market for FYC Advertising through its trades including *Variety*, *The Hollywood Reporter*, and *Deadline*.   By securing the Golden Globes—the most popular Secondary Award—the Penske Trust was able to solidify a vertical monopoly and generate enough leverage to induce market participants to buy exorbitantly priced FYC packages from Penske's trades.   For example, on information and belief, the Penske Trust now offers bundled FYC campaign packages combining the Golden Globes with Big Four awards like the Oscars.   Unlike Penske's other Secondary Awards, the Golden Globes' status as the most popular Secondary Award and precursor to the Oscars gives it sufficient stature to make such bundling both financially and practically viable.

221.   The aforementioned conduct is blatantly monopolistic and anticompetitive, as the Penske Trust has structured the Golden Globes in a manner that excludes and attempts to exclude market participants who cannot or will not purchase FYC advertisements from the Trust.   Instead, the Penske Trust incentivizes pay-to-play market participation that funnels profit directly and exclusively to the Trust through its monopoly on the data company that determines award eligibility and the trades that issue the FYC packages.   This pay-to-play system is open and notorious, with reports noting that the people who are likely to "get worked up about [this] are the publicists who can't pay to play."

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

222.   As such, the Penske Trust leverages its monopoly on the trades that heavily influence, cover, and monetize the awards circuit to funnel profits to the Trust while actively obstructing other market participants.  As one publication recently surmised, "Penske Media controls the awards, the coverage of the awards and seeks to earn money from the people competing for the awards.  It's a perfect circle of not only conflict of interest but the appearance of an extortion racket. (Other publications from The Ankler to the New York Times accept FYC ads.  The crucial distinction is that [they] do not own the show [they] are covering. Nor do [they] control its voting or voters.)"

223.   In addition to harming the public through its anticompetitive conduct, the Penske Trust also participates in false advertising by claiming on its Golden Globes website that the "Golden Globes nominations and awards are determined by an independent body of international journalist voters."  This claim is false and misleading, as many of the voters are employed by the Penske Trust, and the Trust through its data company, trades, and awards prediction company heavily influences the nomination and award process.

224.   The Penske Trust's attempts to obtain a vertical monopoly are further evidenced by its interest in film and television production companies such as A24, which has received top awards for its films after the Penske Trust acquired the Golden Globes, including Best Picture at the 2025 Golden Globes and Best Actor at the 2026 Golden Globes.  The control and conflicts of interest are glaring: Penske-owned trade publications promote Penske-owned contenders for Penske-owned awards predicted by a Penske-owned website.

225.   The Penske Trust has further exacerbated the situation by unlawfully restraining trade and excluding journalists—including HFPA members—from the awards market.

226.   Penske has unlawfully induced journalists to abandon their participation in competing Secondary Awards.  For example, as a condition of the APA, Eldridge

mandated that HFPA members forfeit their Critics Choice credentials, thereby eliminating their voting rights in the Critics Choice Awards ("CCA")—a direct competitor to the Golden Globes. Not only was this a direct restriction on the CCA, but it greatly restricted the journalists who complied with that mandate. HFPA members complied with this exclusionary demand based on the express promise that they would retain lifetime Golden Globes voting rights and lifetime tickets to the Golden Globes Awards, but Penske later reneged on that fundamental promise, guaranteeing voting rights only to those members who accepted direct employment with the Penske Trust—and even then, only for a restrictively narrow window from 2026 to 2028, after which the employed members must reapply annually with no assurance of readmission. This scheme serves a deliberate anticompetitive purpose: it enables the Penske Trust to maintain absolute control over the voter base while creating a mechanism to exclude any voters who challenge or defy Penske's authority. The result is a captured voting body that operates at Penske's discretion rather than as an independent journalistic organization.

227. An even more egregious restraint on trade has been imposed upon those HFPA members who declined to accept or retain employment with the Penske Trust. Those independent journalists were immediately stripped of their promised lifetime voting status and are now compelled to reapply annually to participate as Golden Globes voters, with no guarantee of acceptance or readmission. By coercing journalists to trade their permanent CCA credentials for what proved to be merely a temporary extension of Golden Globes voting rights, Penske orchestrated a calculated double loss: the forfeiture of CCA credentials eliminated these journalists' alternative income streams and professional opportunities in the competitive awards market, including opportunities to compete with Penske, while the failure to deliver on the promise of lifetime Golden Globes access has left them vulnerable to annual exclusion at Penske's discretion. The net result is that these journalists surrendered long-term career security, market access, and the ability to compete with Penske's

trades for a temporary reprieve that can be revoked at will, leaving them at substantial risk of total exclusion from major industry voting bodies—all to serve Penske's ultimate objective of maintaining control over voters and members of the press who cover the entertainment awards market.

228. While other journalists suffer, Penske's Hollywood Trade Publications benefit directly from his monopolies and anticompetitive conduct. For example, at the 2026 Golden Globes, journalists who previously enjoyed exclusive access to the event were barred from the event entirely, and exclusive access was granted instead to journalists from Penske's trades. And in or around May 2026, Penske Media announced that members of the domestic press (*i.e.*, Penske's employees) are now eligible to vote for the Golden Globes, a right that was historically reserved for members of the foreign press. With the HFPA stripped of the leverage that once enabled it to protect members of the foreign press, and on the verge of complete destruction as a result of Penske's and GGF's anticompetitive conduct, HFPA members are now more vulnerable than ever—deprived of the journalistic access and income that came with Golden Globes voting rights, which has now shifted to Penske's trades.

229. On information and belief, to further solidify its stronghold on Hollywood Trade Publications and the corresponding FYC Advertising market, the Penske Trust has endeavored to chill competition by retaliating against journalists who dare to speak out against its anticompetitive conduct.

230. On information and belief, the Penske Trust has created a climate of fear in which members of the press are afraid to speak truthfully about Boehly and Penske's corruption for fear of being blacklisted or other retaliation. According to at least one independent journalist/blogger who reported on this corruption, it appeared that one of Penske's reporters took down the journalist's site by "writing a hit piece" on them. The journalist added that "other bloggers would be wise to watch their backs" because if "Penske is worried about anyone else getting a piece of the pie,

even a teeny tiny slice … all he has to do is start knocking out the competition."

231. The anticompetitive conduct described above was directly facilitated by the Penske Trust's acquisition of the Golden Globes and the subsequent formation of the GGF. That acquisition, achieved through fraud, breaches of fiduciary duty, and other improper and illegal means, enabled the Penske Trust to significantly enhance its market power and profitability, thereby consolidating its dominant position in the industry. Through the GGF, the Penske Trust obscures its anticompetitive practices and strategically extends its influence to suppress competition. To maintain this monopolistic control and preserve the Trust's industry dominance, Defendants have conspired to force a premature dissolution of the HFPA in order to thwart thorough scrutiny and conceal their wrongdoing that underlies the acquisition.

## FIRST CAUSE OF ACTION

### Antitrust Violation Under the Sherman Act [15 U.S.C. § 2]

### Monopolization

### (Against Defendants Penske and Penske Media)

232. The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

233. Penske and Penske Media have violated antitrust laws in entertainment markets. The Relevant Markets include: (i) the market for Hollywood Trade Publications, (ii) the market for Secondary Awards, and (iii) the market for FYC Advertising. These markets are well-defined relevant antitrust markets in the United States.

234. Penske and Penske Media, through the Penske Trust, have monopoly power in these markets. Evidence of their monopoly power includes, among other things, (i) dominant market share in the Relevant Markets, (ii) ownership of major entertainment trade publications, awards shows, and awards data/prediction companies, and (iii) vertical integration that consolidates control over awards, awards voters, advertising, and data markets.

235. Penske and Penske Media, through the Penske Trust, have used a variety of forms of exclusionary conduct to limit and exclude competition from the HFPA and other rivals, allowing Penske and Penske Media to illegally acquire and maintain their monopoly market position. Penske and Penske Media have used their monopoly power to obtain unfair advantages in the market, including, but not limited to, by: (i) structuring awards in a manner that excludes from the market anyone who cannot or will not purchase Major Entertainment Award FYC advertisements from Penske's trades; (ii) controlling the market for those advertisements through their monopoly on the Hollywood Trade Publications that issue the FYC packages; (iii) implementing pay-to-play mechanisms that enrich Defendants while inhibiting access to and fairness of awards shows; (iv) using the Penske Trust's monopoly on Hollywood Trade Publications to improperly influence the awards circuit; (v) inducing journalists to withdraw from competing Secondary Awards; (vi) ensuring that the Penske Trust's own films produced by A24 and MRC receive top awards at the Golden Globes; (vii) using Penske's Hollywood Trade Publications to influence the value of the Golden Globes in order to further expand and enhance Penske's monopoly over the Secondary Awards; (viii) using Penske's data company Luminate to serve as gatekeeper for award consideration; (ix) using Penske's award prediction company Gold Derby to dominate the market on awards show odds making and further exerting improper influence on the awards circuit; and (x) excluding awards voters not associated with the Penske Trust.

236. At all relevant times, Penske and Penske and Penske Media possessed and maintained monopoly power in the Relevant Markets. Penske and Penske Media control a dominant share of these markets, exceeding 70-80% of total industry spend during the annual award season cycle. Penske and Penske Media's market share gives them the power to control prices, extract supracompetitive advertising rates, restrict advertising inventory, and exclude competition across both print and digital trade platforms without losing material business to alternatives.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

237. The HFPA participates in the market for Hollywood Trade Publications through its membership, which consists of foreign journalists who generate and submit journalistic content in this market, including content concerning Hollywood studios, entertainment trends, and other entertainment-industry reporting. The HFPA and its members also offer awards coverage and FYC platforms targeted at film, television, music, and streaming industry professionals. The HFPA and its members compete for jobs, placement, and advertising revenue in the market for Hollywood Trade Publications. Through their anticompetitive conduct, including via their monopoly power, Penske and Penske Media have restricted the HFPA's and its members' ability to participate in this market, thereby restricting output, reducing competition, and further facilitating Penske and Penske Media's ability to extract supracompetitive profits and impose unfair market terms.

238. Not only does the Penske Trust utilize its monopoly in the market for Hollywood Trade Publications to harm competitors by restricting entertainment journalism, but this monopoly is the primary vehicle by which Penske (1) perpetrates the anticompetitive conduct in the FYC Advertising market, and (2) achieves or attempts to achieve a vertical monopoly on Secondary Awards (in conjunction with his production companies, awards data company, and awards prediction company).

239. The HFPA participates in the market for Secondary Awards, including, but not limited to, by founding and operating the Golden Globes, its members providing journalistic coverage of Secondary Awards, and participating in FYC business transactions relating to Secondary Awards. After acquiring control of the Golden Globes through fraud and anticompetitive conduct, including by instigating the Boycott against the HFPA, Penske and Penske Media took deliberate action to exclude the HFPA and its members from participating in this market and to destroy the HFPA, including, but not limited to, excluding HFPA members from the Golden Globes ceremony and red carpet, denying or restricting HFPA members' Golden Globes voting rights if those members did not accept employment with—and thereby

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

did not submit to the control of—the Penske Trust, depriving HFPA members of access to awards contestants and film studios, and colluding with the GGF to destroy the HFPA. This conduct was exclusionary in nature and harmed the competitive process by eliminating a market participant and restricting market alternatives.

240. Penske and Penske Media's conduct has caused injury to customers in the market for Secondary Awards in the form of pay-to-play conditions, supracompetitive prices, and barriers to entry.

241. Penske and Penske Media's conduct has caused injury to competitors in the Secondary Awards market, including, but not limited to, (1) the CCA, which suffered reduced participation in its awards when Penske required that HFPA members withdraw from the CCA as a condition of working with the Golden Globes, and (2) the HFPA, which Penske and Penske Media have all but destroyed.

242. The HFPA has suffered injuries inextricably intertwined with the injuries to customers and competitors in the Secondary Awards market by (1) being forced out of the market by a Boycott instigated by Penske, who used the Boycott to orchestrate a scheme to secretly acquire his competitor's Secondary Award and then force that competitor to go out of business; (2) fraudulent depletion of its resources resulting from Penske's collusion to force the HFPA's dissolution and his ongoing effort to engage in a quid-pro-quo with the GGF in attempt to force the HFPA to dissolve; and (3) lost revenue from the Boycott and cancellation of the 2022 Golden Globes broadcast.

243. The HFPA is also entitled to injunctive relief on behalf of its members, who suffered injuries, inextricably intertwined with the injuries to customers and competitors in the Secondary Awards market, in the form of lost access to the substantial majority of Secondary Awards, as those awards are controlled by their adversary the Penske Trust. Such access directly translates into income, as a primary function of those member-journalists is to cover those awards.

Kasowitz LLP
Attorneys at Law
Los Angeles

COMPLAINT

244. The injuries of the HFPA and its members are inextricably intertwined with the Penske Trust's goal of instituting pay-to-play schemes, supracompetitive prices, and reducing its competitors' partnerships and/or completely forcing them out of the Secondary Awards market.

245. Prior to the APA, the HFPA and its members participated in the FYC Advertising market, including, but not limited to, by offering awards candidates and film studios premium opportunities to meet directly with awards voters via exclusive FYC screenings and interviews. This offered a viable alternative to advertising in Penske's Hollywood Trade Publications, and for many HFPA members, these business opportunities represented a substantial percentage—if not all—of their journalistic work. After acquiring the Golden Globes, Penske took concerted measures to exclude the HFPA from this market, including, but not limited to, excluding HFPA members from the Golden Globes ceremony and red carpet, denying or restricting HFPA members' Golden Globes voting rights if those members did not accept employment with—and thereby did not submit to the control of—the Penske Trust, depriving HFPA members of access to awards contestants and film studios, and colluding with the GGF to destroy the HFPA.

246. Penske and Penske Media's conduct has caused injury to customers in the market for FYC Advertising in the form of supracompetitive prices. Penske and Penske Media's actions have not merely injured individual competitors, but have artificially restrained market-wide output, inflated advertising costs, and diminished quality across the industry

247. Penske and Penske Media's conduct has caused injury to competitors in the market for FYC Advertising, including, but not limited to, the HFPA and its members, whom Defendants have forced out of the market.

248. The HFPA has suffered injuries inextricably intertwined with the injuries to customers and competitors in the market for FYC Advertising by (1) being forced out of the market, as consumers previously engaged the HFPA to host

exclusive FYC events in which those consumers could directly advertise their submissions, and without that opportunity, consumers are now diverted to Penske Media or face a Hobson's choice of advertising with a less effective outlet that is not a viable substitute; (2) fraudulent depletion of its resources resulting from Penske's collusion to force the HFPA's dissolution and his ongoing effort to engage in a quid-pro-quo with the GGF in attempt to force the HFPA to dissolve; and (3) lost revenue from the Boycott and cancellation of the 2022 Golden Globes broadcast.

249.   The HFPA is also entitled to injunctive relief on behalf of its members, who suffered injuries, inextricably intertwined with the injuries to customers and competitors in the market for FYC Advertising, in the form of lost income, as they substantially relied on the HFPA's FYC opportunities, including screenings, press conferences, and exclusive interviews to generate their journalistic content, and this major component of their income is now gone.

250.   The injuries of the HFPA and its members are inextricably intertwined with the Penske Trust's goal of implementing supracompetitive prices and destroying its competition; indeed, their injuries were either the object or the proximate result of the Penske Trust's conduct aimed at harming market participants.

251.   As a direct, proximate, and foreseeable result of Penske and Penske Media's exclusionary and anticompetitive conduct, competition in the Hollywood Trade Publications, Secondary Awards, and FYC Advertising markets has been severely harmed.

252.   Penske and Penske Media's conduct is willful, lacks any legitimate business justification, and is solely intended to exclude competition and maintain their monopoly position.

253.   Penske and Penske Media's conduct has occurred in and substantially affected interstate commerce.

254.   Penske and Penske Media's exclusionary conduct has caused substantial harm to competition and specific and cognizable injuries to the HFPA and its

members, including, but not limited to, exclusion from the Relevant Markets, deprivation of business opportunities and the ability to protect and promote the interests of foreign journalists, and financial harm.

255.   As a result of Penske and Penske Media's unlawful monopolization, the HFPA is entitled to, among other things, injunctive relief, treble damages, and any other relief the court deems just and proper.

## SECOND CAUSE OF ACTION

### Antitrust Violation Under the Sherman Act [15 U.S.C. § 2]

### Attempted Monopolization

### (Against Defendants Penske and Penske Media)

256.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

257.   Penske and Penske Media have attempted to violate antitrust laws in entertainment markets.  The Relevant Markets include: (i) the market for Hollywood Trade Publications, (ii) the market for Secondary Awards, and (iii) the market for FYC Advertising.  These markets are well-defined relevant antitrust markets in the United States.

258.   Penske and Penske Media, through the Penske Trust, have attempted to engage in and engaged in anticompetitive and exclusionary conduct with the specific intent to monopolize the relevant markets, including, but not limited to, by: (i) structuring awards in a manner that excludes from the market anyone who cannot or will not purchase FYC advertisements from Penske's trades; (ii) controlling the market for those advertisements through their monopoly on the trades that issue the FYC packages; (iii) implementing pay-to-play mechanisms that enrich Defendants while inhibiting access to and fairness of awards shows; (iv) using the Penske Trust's monopoly on Hollywood Trade Publications to improperly influence the awards circuit; (v) inducing journalists to withdraw from competing Secondary Awards; (vi) ensuring that the Penske Trust's own films produced by A24 and MRC receive

top awards at the Golden Globes; (vii) using Penske's Hollywood Trade Publications to influence the value of the Golden Globes in order to further expand and enhance Penske's monopoly over the Secondary Awards; (viii) using Penske's data company Luminate to serve as gatekeeper for award consideration; (ix) using Penske's award prediction company Gold Derby to dominate the market on awards show odds making and further exerting improper influence on the awards circuit; and (x) excluding awards voters not associated with the Penske Trust.

259. At all relevant times, Penske and Penske and Penske Media possessed and maintained monopoly power in the Relevant Markets. Penske and Penske Media control a dominant share of these markets, exceeding 70-80% of total industry spend during the annual award season cycle. Penske and Penske Media's market share gives them the power to control prices, extract supracompetitive advertising rates, restrict advertising inventory, and exclude competition across both print and digital trade platforms without losing material business to alternatives.

260. The HFPA participates in the market for Hollywood Trade Publications through its membership, which consists of foreign journalists who generate and submit journalistic content in this market, including content concerning Hollywood studios, entertainment trends, and other entertainment-industry reporting. The HFPA and its members also offer awards coverage and FYC platforms targeted at film, television, music, and streaming industry professionals. The HFPA and its members compete for jobs, placement, and advertising revenue in the market for Hollywood Trade Publications. Through their anticompetitive conduct, including via their monopoly power, Penske and Penske Media have restricted the HFPA and its members' ability to participate in this market, thereby restricting output, reducing competition, and further facilitating Penske and Penske Media's ability to extract supracompetitive profits and impose unfair market terms.

261. Not only does the Penske Trust utilize its monopoly in the market for Hollywood Trade Publications to harm competitors by restricting entertainment

journalism, but this monopoly is the primary vehicle by which Penske (1) perpetrates and attempts to perpetrate the anticompetitive conduct in the FYC Advertising market, and (2) achieves and attempts to achieve a vertical monopoly on Secondary Awards (in conjunction with his production companies, awards data company, and awards prediction company).

262.   The HFPA participates in the market for Secondary Awards, including, but not limited to, by founding and operating the Golden Globes, its members providing journalistic coverage of Secondary Awards, and participating in FYC business transactions relating to Secondary Awards.  After acquiring control of the Golden Globes through fraud and anticompetitive conduct, including by instigating the Boycott against the HFPA, Penske and Penske Media took deliberate action to exclude the HFPA and its members from participating in this market and to destroy the HFPA, including, but not limited to, excluding HFPA members from the Golden Globes ceremony and red carpet, denying or restricting HFPA members' Golden Globes voting rights if those members did not accept employment with—and thereby did not submit to the control of—the Penske Trust, depriving HFPA members of access to awards contestants and film studios, and colluding with the GGF to destroy the HFPA.  This conduct was exclusionary in nature and harmed the competitive process by eliminating a market participant and restricting market alternatives.

263.   Penske and Penske Media's conduct has caused and attempted to cause injury to customers in the Secondary Awards market in the form of pay-to-play conditions, supracompetitive prices, and barriers to entry.

264.   Penske and Penske Media's conduct has caused and attempted to cause injury to competitors in the Secondary Awards market, including, but not limited to, (1) the CCA, which suffered reduced participation in its awards when Penske required that HFPA members withdraw from the CCA as a condition of working with the Golden Globes, and (2) the HFPA, which Penske and Penske Media have all but destroyed.

265. The HFPA has suffered injuries inextricably intertwined with the injuries to customers and competitors in the Secondary Awards market by (1) being forced out of the market by a Boycott instigated by Penske, who used the Boycott to orchestrate a scheme to secretly acquire his competitor's Secondary Award and then force that competitor to go out of business; (2) fraudulent depletion of its resources resulting from Penske's collusion to force the HFPA's dissolution and his ongoing effort to engage in a quid-pro-quo with the GGF in attempt to force the HFPA to dissolve; and (3) lost revenue from the boycott and cancellation of the 2022 Golden Globes broadcast.

266. The HFPA seeks injunctive relief on behalf of its members, who suffered injuries, inextricably intertwined with the injuries to customers and competitors in the Secondary Awards market, in the form of lost access to the substantial majority of Secondary Awards, as those awards are controlled by their adversary the Penske Trust. Such access directly translates into income, as a primary function of those member-journalists is to cover those awards.

267. The injuries of the HFPA and its members are inextricably intertwined with the Penske Trust's goal of instituting pay-to-play schemes, supracompetitive prices, and reducing its competitors' partnerships and/or completely forcing them out of the Secondary Awards market.

268. Prior to the APA, the HFPA and its members participated in the FYC Advertising market, including, but not limited to, by offering awards candidates and film studios premium opportunities to meet directly with awards voters via exclusive FYC screenings and interviews. This offered a viable alternative to advertising in Penske's Hollywood Trade Publications, and for many HFPA members, these business opportunities represented a substantial percentage—if not all—of their journalistic work. After acquiring the Golden Globes, Penske took concerted measures to exclude the HFPA from this market, including, but not limited to, excluding HFPA members from the Golden Globes ceremony and red carpet,

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

71

COMPLAINT

denying or restricting HFPA members' Golden Globes voting rights if those members did not accept employment with—and thereby did not submit to the control of—the Penske Trust, depriving HFPA members of access to awards contestants and film studios, and colluding with the GGF to destroy the HFPA.

269. Penske and Penske Media's conduct has caused and attempted to cause injury to customers in the market for FYC Advertising in the form of supracompetitive prices. Penske and Penske Media's actions have not merely injured individual competitors, but have artificially restrained market-wide output, inflated advertising costs, and diminished quality across the industry.

270. Penske and Penske Media's conduct has caused and attempted to cause injury to competitors in the market for FYC Advertising, including, but not limited to, the HFPA and its members, whom Penske and Penske Media have forced out of the market.

271. The HFPA has suffered injuries inextricably intertwined with the injuries to customers and competitors in the market for FYC Advertising by (1) being forced out of the market as consumers previously engaged the HFPA to host exclusive FYC events in which those consumers could directly advertise their submissions, and without that opportunity, consumers are now diverted to Penske Media or face a Hobson's choice of advertising with a less effective outlet that is not a viable substitute; (2) fraudulent depletion of its resources resulting from Penske's collusion to force the HFPA's dissolution and his ongoing effort to engage in a quid-pro-quo with the GGF in attempt to force the HFPA to dissolve; and (3) lost revenue from the Boycott and cancellation of the 2022 Golden Globes broadcast.

272. The HFPA is also entitled to injunctive relief on behalf of its members, who suffered injuries, inextricably intertwined with the injuries to customers and competitors in the market for FYC Advertising, in the form of lost income, as they substantially relied on the HFPA's FYC opportunities, including screenings, press

conferences, and exclusive interviews to generate their journalistic content, and this major component of their income is now gone.

273. The injuries of the HFPA and its members are inextricably intertwined with the Penske Trust's goal of implementing supracompetitive prices and destroying its competition—indeed, their injuries were either the object or the proximate result of Penske Trust's conduct aimed at harming market participants.

274. Penske and Penske Media have engaged and attempted to engage in such practices with the specific intent to exclude competition and obtain an unlawful monopoly, and through such conduct Defendants have a dangerous probability of succeeding in monopolizing the relevant markets. There is no legitimate business justification for this conduct. This course of conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act.

275. As a direct, proximate, and foreseeable result of Penske and Penske Media's exclusionary and anticompetitive conduct, competition in the Hollywood Trade Publications, Secondary Awards, and FYC Advertising markets has been severely harmed.

276. Penske and Penske Media's conduct has occurred in and substantially affected interstate commerce.

277. Penske and Penske Media's attempted exclusionary conduct has caused and attempted to cause substantial harm to competition and specific and cognizable injuries to the HFPA and its members, including, but not limited to, exclusion from the Relevant Markets, deprivation of business opportunities and the ability to protect and promote the interests of foreign journalists, and financial harm.

278. As a result of Penske and Penske Media's attempted unlawful monopolization, the HFPA is entitled to, among other things, injunctive relief, treble damages, and any other relief the court deems just and proper.

## THIRD CAUSE OF ACTION

### Antitrust Violation Under the Sherman Act [15 U.S.C. § 2]

### Conspiracy to Monopolize

### (Against All Defendants)

279. The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

280. Beginning in or around 2021, Defendants agreed with one another, directly and indirectly, to violate antitrust laws by monopolizing certain entertainment markets, excluding competition in those markets and harming competitors. The Relevant Markets include: (i) the market for Hollywood Trade Publications, (ii) the market for Secondary Awards, and (iii) the market for FYC Advertising. These markets are well-defined, relevant antitrust markets in the United States.

281. Each Defendant joined the above agreement knowing of its objectives and intending to assist in or advance the monopolization by the Penske Trust of the Relevant Markets.

282. Defendants committed one or more overt acts in furtherance of the conspiracy to monopolize the Relevant Markets, including, but not limited to: (i) entering into agreements between and among Penske, Penske Media, Goeckner, and the GGF to exclude competitors from the awards market; (ii) brokering and entering into the APA and Assignment, which were designed to consolidate Defendants' control over the Golden Globes and Relevant Markets; (iii) colluding to facilitate the acquisition of the Golden Globes; and (iv) excluding competitors, including by Penske and Penske Media offering bribes to GGF Board members in exchange for agreeing to cooperate in efforts to dismantle and dissolve the HFPA.

283. Defendants engaged in anticompetitive conduct pursuant to the conspiracy, including (i) structuring awards in a manner that excludes from the market anyone who cannot or will not purchase FYC advertisements from Penske's

trades; (ii) controlling the market for those advertisements through their monopoly on the trades that issue the FYC packages; (iii) implementing pay-to-play mechanisms that enrich Defendants while inhibiting access to and fairness of awards shows; (iv) using the Penske Trust's dominance of the Premier Hollywood Trades to improperly influence the awards circuit; (v) inducing journalists to withdraw from competing Secondary Awards; (vi) ensuring that the Penske Trust's own films produced by A24 and MRC receive top awards at the Golden Globes; (vii) using Penske's Premier Hollywood Trades to influence the value of the Golden Globes in order to further expand and enhance Penske's monopoly over Secondary Awards; (viii) using Penske's data company Luminate to serve as gatekeeper for award consideration; (ix) using Penske's award prediction company Gold Derby to dominate the market on awards show odds making and further exerting improper influence on the awards circuit; and (x) excluding awards voters not associated with the Penske Trust.

284.    The conspiracy was designed to exclude competition and to enable Penske and Penske Media to achieve monopoly power in the Relevant Markets.

285.    The conspiracy substantially affected interstate commerce.

286.    Defendants' conduct has caused and attempted to cause substantial harm to competition and specific and cognizable injuries to the HFPA and its members, including, but not limited to, exclusion from the Relevant Markets, deprivation of business opportunities and the ability to protect and promote the interests of foreign journalists, and financial harm.

287.    Defendants' unlawful conduct is ongoing and threatens to cause continuing and irreparable harm to the HFPA and to competition in the Relevant Markets.

288.    As a result of Defendants' conspiracy, the HFPA is entitled to, among other things, injunctive relief, treble damages, and any other relief the court deems just and proper.

# FOURTH CAUSE OF ACTION

## Antitrust Violation Under the Sherman Act [15 U.S.C. § 1]

## Unlawful Restraint on Trade

## (Against Defendants Penske and Penske Media)

289.    The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

290.    Penske and Penske Media have violated antitrust laws in entertainment markets.    The relevant markets include: (i) the market for Hollywood Trade Publications, (ii) the market for Secondary Awards, and (iii) the market for FYC Advertising.   These markets are well-defined relevant antitrust markets in the United States.

291.    The HFPA participates in the market for Hollywood Trade Publications through its membership, which consists of foreign journalists who generate and submit journalistic content in this market, including content concerning Hollywood studios, entertainment trends, and other entertainment-industry reporting.  The HFPA and its members also offer awards coverage and FYC platforms targeted at film, television, music, and streaming industry professionals.  The HFPA and its members compete for jobs, placement, and advertising revenue in the market for Hollywood Trade Publications.

292.    The HFPA participates in the market for Secondary Awards, including, but not limited to, by founding and operating the Golden Globes, its members providing journalistic coverage of Secondary Awards, and participating in FYC business transactions relating to Secondary Awards.

293.    Prior to the APA, the HFPA and its members participated in the FYC Advertising market, including, but not limited to, by offering awards candidates and film studios premium opportunities to meet directly with awards voters via exclusive FYC screenings and interviews.  This offered a viable alternative to advertising in Penske's Hollywood Trade Publications, and for many HFPA members, these

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

76

COMPLAINT

business opportunities represented a substantial percentage—if not all—of their journalistic work.

294.   Penske and Penske Media made agreements with Boehly, Eldridge, the GGF, and Goeckner through and in furtherance of the APA and of the Penske Trust's goal of restraining trade.  Penske and Penske Media, through the Penske Trust, have substantial market power in these Relevant Markets.  Evidence of their substantial market power includes, among other things, (i) dominant market share in the Relevant Markets, (ii) ownership of major Hollywood Trade Publications, Secondary Awards, and awards data/prediction companies, and (iii) vertical integration that consolidates control over awards, advertising, and data markets.

295.   Penske and Penske Media have engaged in concerted action and agreements that unreasonably restrain trade, including, but not limited to, (i) agreements between and among Penske, Penske Media, Goeckner, and the GGF to exclude competitors from the awards market, (ii) the APA between Eldridge and the HFPA and the Assignment between the HFPA and the GGF, which were designed to consolidate Penske and Penske Media's control over the Golden Globes and related markets, and (iii) collusion with Eldridge and Boehly to facilitate the acquisition of the Golden Globes and exclude competitors, including by instigating the Boycott and dismantling the HFPA.

296.   Penske and Penske Media's agreements and concerted actions constitute unreasonable restraints on trade because, among other things, (i) they were written, enforced, and performed with the intent and effect of restraining competition in the relevant markets, (ii) they lack any legitimate business justification, and (iii) they have caused substantial anticompetitive effects, including exclusion of competitors, manipulation of market structures, and harm to consumers.

297.   There is no legitimate business justification for this conduct and Penske and Penske Media have engaged in this conduct and enforced these agreements with the intent and effect of unreasonably restraining competition in the Relevant Markets.

298.   Penske and Penske Media conduct has occurred in and substantially affected interstate commerce.

299.   Penske and Penske Media's unlawful restraints on trade have caused substantial harm to competition and specific and cognizable injuries to the HFPA, including, but not limited to, exclusion from the Relevant Markets, deprivation of business opportunities and the ability to protect and promote the interests of foreign journalists, financial harm, and injuries to the Relevant Markets, including supracompetitive FYC Advertising prices and pay-to-play conditions.

300.   As a result of Penske and Penske Media's unlawful restraint on trade, the HFPA is entitled to, among other things, injunctive relief, treble damages, and any other relief the court deems just and proper.

## FIFTH CAUSE OF ACTION

**Violation of the Clayton Act - Unlawful Corporate Acquisition [15 U.S.C. § 18]**

**(Against All Defendants)**

301.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

302.   At all relevant times, Penske, Penske Media, and the HFPA were engaged in commercial activities affecting interstate commerce and subject to the jurisdiction of the Federal Trade Commissions.

303.   Penske and Penske Media directly acquired the assets of the HFPA, including its intellectual property rights in the Golden Globes.  The GGF was formed in furtherance of that acquisition so it could pass regulatory scrutiny, and so Penske and Penske Media could utilize a non-profit organization and its charitable assets, including through collusion with Goeckner, in furtherance of their anticompetitive purposes.

304.   The effects of that acquisition have been and may continue to be (1) substantially to lessen competition and (2) the creation of a monopoly.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

78

COMPLAINT

305. There are high barriers to entry for each of the Relevant Markets, including the high costs of starting a new Secondary Award, Hollywood Trade Publication, or FYC Advertising platform that could reasonably compete with Penske and Penske Media's Secondary Awards, Hollywood Trade Publications, and FYC Advertising platforms.

306. The unlawful impediments to competition and monopoly resulting from the acquisition have caused substantial harm to competition and specific, cognizable antitrust injuries to the HFPA, including, but not limited to, excluding the HFPA and its members from the Relevant Markets, depriving the HFPA and its members of business opportunities and their ability to protect and promote the interests of foreign journalists, reduced competitive output in favor of the journalists who work for the Penske Trust, injury to advertisers through higher prices for FYC Advertising and reduced competition in the Secondary Awards market based on vertical integration, and other financial harm.

307. As a result of Defendants' conduct, the HFPA is entitled to, among other things, injunctive relief, treble damages, and such other and further relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION

### Violation of the Cartwright Act – Unlawful Restraint on Trade

### [California Bus. & Prof. Code § 16720 et seq.]

### (Against All Defendants)

308. The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

309. California Business & Professions Code §§ 16700, et seq., prohibit restraints on trade, which means and includes trusts under Section 16720.

310. "Any contract or agreement in violation of this chapter is absolutely void and is not enforceable at law or in equity." *Id.* § 16722.

311. Penske and Penske Media have violated antitrust laws in entertainment markets. The Relevant Markets include: (i) the market for Hollywood Trade Publications, (ii) the market for Secondary Awards, and (iii) the market for FYC Advertising. These markets are well-defined relevant antitrust markets in California.

312. Penske and Penske Media, through the Penske Trust, have monopoly power in these markets. Evidence of their monopoly power includes, among other things, (i) dominant market share in the Relevant Markets, (ii) ownership of major entertainment trade publications, awards shows, and awards data/prediction companies, and (iii) vertical integration that consolidates control over awards, advertising, and data markets.

313. Penske and Boehly, through the APA, required that HFPA members—all of whom are foreign and independent journalists—accept employment with Eldridge as a condition to membership in the GGF. In doing so, Penske and Boehly formed a combination with the GGF.

314. Eldridge, through its combination with Penske and Penske Media, owns the Hollywood Trade Publications that directly compete with the journalists that Penske and Boehly coerced into joining Eldridge. As such, Penske and Boehly's combination with the GGF was formed for the purpose of carrying out restrictions in trade and commerce by monopolizing entertainment journalism and penalizing any journalists who refused to join their monopoly, including by excluding those journalists from access to the awards circuit and retaliating against journalists who report on their unfair practices.

315. Defendants further illegally conspired to form an unlawful trust by acquiring assets, including through their combination with Boehly and Eldridge, and together engaging in acts for the purpose of creating and carrying out restrictions on trade and commerce.

316. Defendants through their conduct alleged herein intended to and did exclude the HFPA and its members from the Relevant Markets, deprive the HFPA

and its members of business opportunities and their ability to protect and promote the interests of foreign journalists, and reduce competitive output in favor of the journalists who work for the Penske Trust.

317. The Assignment was entered into in furtherance of the unlawful trust and is therefore void.

318. Defendants' unlawful restraint on trade has injured the HFPA by, among other things, inducing the HFPA to gift away millions of dollars in assets for no consideration, coercing the HFPA to take steps towards dissolution, depriving the HFPA of its ability to advance the interests of its members, destroying the HFPA's ability to participate in the entertainment awards market, and subjecting HFPA members to retaliation from Defendants, including, but not limited to, exclusion from the awards market. Defendants' unlawful restraint on trade also impacted the ability of others to participate in Hollywood Trade Publications and compete for Secondary Awards, and injured pricing in FYC Advertising through supracompetitive pricing and pay-to-play requirements.

319. As a result of Defendants' conduct, the HFPA is entitled to actual damages, treble damages, pre- and post-judgment interest, injunctive relief, attorney's fees, and such other and further relief as the Court deems just and proper.

320. At all relevant times, Goeckner and Penske were either directors, officers, or agents of the GGF and Penske Media, respectively, and assisted or aided in the violations set forth herein. As such, both Goeckner and Penske are jointly and severally liable for all damages resulting from Defendants' unfair trade practices.

## SEVENTH CAUSE OF ACTION

### Unfair Trade Practices

### [California Bus. & Prof. Code §§ 17000 et seq.]

### (Against All Defendants)

321. The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

81

COMPLAINT

322. The "purpose of [Section 17000 et seq.] is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Cal. Bus. & Prof. Code § 17001.

323. "Any person or trade association may bring an action to enjoin and restrain any violation of this chapter and, in addition thereto, for the recovery of damages." Cal. Bus. & Prof. Code § 17070.

324. California Business & Professions Code §§ 17000, et seq., expressly prohibit unfair trade practices, which means and includes, *inter alia*, (1) selling or offering "any [ ] product at less than the cost thereof … for the purpose of injuring competitors or destroying competition," *id.* § 17043, and (2) using boycotts to coerce third parties not to deal with a competitor, *id.* § 17046.

325. The HFPA is a non-profit mutual benefit organization that exists to further the interests of its members—*i.e.,* foreign film and entertainment journalists. Penske and Penske Media have a monopoly on Hollywood Trade Publications and are therefore direct competitors with the HFPA.

326. Penske and Penske Media engaged in unfair trade practices by (1) using their media outlets to facilitate and coerce a Boycott of the HFPA to compel third parties not to deal with the HFPA, thereby injuring and destroying the HFPA, in violation of California Business & Professions Code § 17043, (2) offering to sell intellectual property to the GGF at less than the cost thereof for the purpose of inducing the GGF to assist Penske and Penske Media in their efforts to injure and destroy the HFPA in violation of California Business & Professions Code § 17046, and (3) offering GGF members extended Golden Globes voting rights and complimentary ballroom seats for the awards ceremony if they will (falsely) assert that all of the HFPA's claims relating to the APA have been assigned to the GGF and

sign waivers purporting to release those claims, and/or if they can induce the HFPA to dissolve, in violation of California Business & Professions Code § 17043.

327. Defendants, through the Penske Trust, further engaged in unfair trade practices by using their monopoly power to obtain unfair advantages in the Relevant Markets, including, but not limited to, by: (i) structuring the Golden Globes in a manner that excludes from the market anyone who cannot or will not purchase FYC advertisements from Penske's trades; (ii) controlling the market for those advertisements through their monopoly on the trades that issue the FYC packages; (iii) implementing pay-to-play mechanisms that enrich Defendants while inhibiting access to and fairness of awards shows; (iv) using the Penske Trust's monopoly on Hollywood Trade Publications to improperly influence the awards circuit; (v) inducing journalists to withdraw from competing Secondary Awards; (vi) ensuring that the Penske Trust's own films produced by A24 and MRC receive top awards; (vii) using Penske's data company Luminate to serve as gatekeeper for award consideration; (viii) using Penske's award prediction company Gold Derby to dominate the market on awards show odds making and further exerting improper influence on the awards circuit; and (ix) excluding awards voters not associated with the Penske Trust.

328. Defendants' unfair trade practices have injured the HFPA by, among other things, inducing the HFPA to gift away millions of dollars in assets for no consideration, coercing the HFPA to take steps toward dissolution, depriving the HFPA of its ability to advance the interests of its members, destroying the HFPA's ability to participate in the entertainment awards market, subjecting HFPA members to retaliation from Defendants, including, but not limited to, exclusion from the awards market, and causing the HFPA to spend millions of dollars in legal fees to investigate and litigate Defendants' unfair trade practices.

329. At all relevant times Goeckner and Penske were either directors, officers, or agents of the GGF or Penske Media, respectively, and assisted or aided

in the violations set forth herein.  As such, both Goeckner and Penske are jointly and severally liable for all damages resulting from Defendants' unfair trade practices.

330.   As a result of Defendants' unfair trade practices, the HFPA is entitled to, among other things, injunctive relief, treble damages, attorney's fees, and such other and further relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

### Unfair Competition

### [California Bus. & Prof. Code §§ 17200 et seq.]

### (Against All Defendants)

331.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

332.   Defendants have engaged in a combination of capital, skill, and acts to unlawfully restrain trade and limit competition in violation of California law.

333.   By engaging in the conduct alleged above, Defendants have engaged in unlawful, unfair, and/or fraudulent business acts of unfair competition in violation of California Business and Professions Code §§ 17200, et seq.

334.   Defendants' conduct is "unlawful" within the meaning of § 17200 because it violates multiple independent laws, including, but not limited to, federal and state antitrust laws.

335.   Specifically, Defendants have, among other things: (i) structured the Golden Globes and other awards shows to exclude market participants who cannot or will not purchase Major Entertainment Award FYC advertisements from Penske and Penske Media's trade publications, thereby creating an unlawful barrier to entry; (ii) monopolized the market for FYC Advertising and required studios and production companies to purchase exorbitantly priced FYC packages from Penske and Penske Media's trade publications; (iii) implemented pay-to-play mechanisms to enrich Defendants while inhibiting access to and fairness of the awards circuit; (iv) used vertical integration to dominate the entertainment awards market by

controlling both the awards shows and the advertising platforms that influence awards outcomes, including ensuring that films produced by A24, in which Penske and Penske Media have financial interests, receive top awards; and (v) leveraged monopoly power in the Hollywood Trade Publications market to exclude competitors, manipulate public perception, and influence awards outcomes in favor of Defendants' interests.

336. Defendants' conduct is "unfair" within the meaning of § 17200 because it offends established public policy and is immoral, unethical, oppressive, and substantially injurious to competition and to independent creators.

337. The gravity of the harm to the HFPA and to the markets for Hollywood Trade Publications, Secondary Awards, and FYC Advertising substantially outweighs any countervailing benefits of Defendants' conduct. Defendants' practices undermine the integrity of the entertainment-industry awards system and FYC advertisements and distort fair competition by rewarding pay-to-play exclusion and profiteering over lawful commerce.

338. Defendants' conduct is "fraudulent" within the meaning of § 17200 because it is likely to deceive members of the public and industry participants. Defendants' fraudulent conduct includes, but is not limited to: (i) concealing Penske's involvement in the APA; (ii) instigating the Boycott that led consumers to believe there were bona fide problems with the organization and that consumers should therefore refrain from engaging with the HFPA; and (iii) claiming that Golden Globes nominations and awards are determined by an independent body of international journalist voters when in fact many of the voters are employed by the Penske Trust, and the trust through its data company, trades, and awards prediction company heavily influences the nomination and award process.

339. Defendants' acts and omissions were likely to deceive a reasonable consumer, business partner, and market participant regarding the legitimacy of the Golden Globes and the fairness of advertising packaging.

340.   As a result of Defendants' unfair competition, the HFPA has suffered injury in fact and lost money or property, including, but not limited to, all HFPA assets that were transferred to the GGF.

341.   Defendants have unjustly retained revenues and profits obtained through unfair competition, including assets transferred pursuant to the APA, the Assignment, and the approximately $4 million unlawfully transferred from the Reserve.  The HFPA seeks restitution of all money and property wrongfully obtained, as well as disgorgement of Defendants' ill-gotten gains, to restore the HFPA and the marketplace to the status quo ante.

342.   Defendants' unlawful, unfair, and fraudulent practices are ongoing and threaten to continue unless restrained by this Court.  The HFPA seeks preliminary and permanent injunctive relief prohibiting Defendants from engaging in further anticompetitive conduct, including their pay-to-play schemes, exclusionary practices, intimidation of stakeholders, manipulation of the awards circuit, profiteering, and retaliation against journalists.

## NINTH CAUSE OF ACTION

**Rescission and Cancellation of Assignment [Cal. Civ. Code §§ 1689 and 3412]**

**(Assignment Unlawful Due to Fraud, Violations of State and Federal Antitrust Laws, and Legal Malpractice)**

**(Against Defendant GGF)**

343.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

344.   A party to a contract may rescind the contract if the consent of the party rescinding was obtained through fraud, the contract is unlawful for causes which do not appear in its terms or conditions and the parties are not equally at fault, or the public interest will be prejudiced by permitting the contract to stand.  Cal. Civ. Code § 1689.

345. "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon her application, be so adjudged, and ordered to be delivered up or canceled." Cal. Civ. Code § 3412.

346. Once a contract has been found to be void and cancelled, Plaintiff is entitled to restitution of all monies paid, including closing costs and interest and principal payments. Cal. Civ. Code § 1692.

347. The Assignment is unlawful because it was conceived and executed in furtherance of violations of state and federal antitrust laws, unfair trade practices, and violations of California's Unfair Competition law.

348. In addition, the Assignment is the product of fraud underscored by conflicts of interest. Goeckner, who was the HFPA's General Counsel at the time of the Assignment, was on both sides of the transaction as he had already secured a position as CEO of the GGF and even signed the Assignment in his capacity as CEO of the GGF. Hoehne was also conflicted, as she was serving as President of the HFPA while also serving as President of Penske and Boehly's Golden Globes LLC and a member of the GGF Board of Directors at the time of the Assignment, and placed the interests of advancing their unlawful trust over the interests of the HFPA.

349. In furtherance of their self-interests, Goeckner and Hoehne fraudulently induced the HFPA to enter into the Assignment by, among other things, representing to the HFPA that doing so was in the best interests of the HFPA when it was not. Goeckner and Hoehne knew those representations were false when they made them because they fully intended to use the Assignment to strip the HFPA of all its assets and force it to dissolve before the HFPA could investigate the malfeasance of the APA, thereby leaving the organization and its members (*i.e.*, Goeckner's own clients and Hoehne's own constituents) without protection or recourse. Goeckner and Hoehne made these misrepresentations with the intent of inducing the HFPA to enter into the Assignment and for purposes of securing their dream jobs as the CEO of the

GGF and President of Golden Globes, LLC, respectively. The HFPA was justified in relying on Goeckner's and Hoehne's misrepresentations because they were the HFPA's General Counsel, COO, and President at the time. As a result of Goeckner's and Hoehne's misrepresentations, the HFPA entered into the Assignment under false pretenses, and Goeckner immediately thereafter began using the Assignment to strip the HFPA of its assets.

350. The Assignment also violates Section 19 of the Clayton Act, which prohibits individuals from serving simultaneously as directors or officers of two corporations that are engaged in interstate commerce and are competitors. The HFPA, the GGF, and Globes LLC were at all relevant times engaged in interstate commerce, and the GGF and Globes LLC were and are situated as competitors with respect to the HFPA. During the relevant time period, the HFPA, the GGF, and Globes LLC each had capital assets, surplus, and undivided profits aggregating more than $48,559,000, and each of their competitive sales were more than $4,855,900. Goeckner entered into and signed the Assignment while simultaneously serving as an officer of both the HFPA and the GGF, and Hoehne entered into and signed the Assignment while simultaneously serving as an officer and/or director of the HFPA, Globes LLC, and the GGF. As such, both Hoehne and Goeckner entered into and signed the Assignment as part of an unlawful interlocking directorate, the purpose and effect of which was to eliminate competition.

351. The Assignment is further tainted by Goeckner's legal malpractice, which consists of, among other things: (i) advising the HFPA to gift away millions of dollars for no consideration through the unlawful Amendment to the APA; (ii) facilitating the unlawful Amendment to the APA, including by failing to allow the HFPA due time to consider the corresponding resolution, belatedly notifying the HFPA Board about the proposed resolution, and failing to advise the HFPA as to its rights and remedies relating to the Amendment and the financial consequences of entering into it; (iii) allowing and facilitating Hoehne and Boehly 's efforts to release

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

88

COMPLAINT

the HFPA's claims against NBC and MRC and depriving the HFPA of any recourse in connection with the canceled 2022 Golden Globes broadcast; (iv) negotiating the Assignment after he had already accepted a role as CEO of the GGF, the HFPA's counterparty to the Assignment, and signing the Assignment in his capacity as GGF CEO; (v) burying a backdoor provision in the June 2024 Resolution while serving as HFPA General Counsel in order to facilitate his efforts to induce fraudulent transfers from the HFPA to his new employer once he officially assumed the role as GGF CEO; (vi) advising the HFPA to enter into the Assignment and claiming it was in the HFPA's best interest when it was not; (vii) fraudulently inducing the Treasurer to unlawfully transfer funds from the HFPA to the GGF in an effort to deprive his former client of approximately $4 million; (viii) involving himself in disputes between the GGF and the HFPA and acting against the HFPA in those disputes; (ix) threatening GGF members to prevent them from agreeing to return the unlawfully transferred funds; (x) conspiring with Penske, Boehly, Hoehne, and the Penske Trust to destroy the HFPA; (xi) refusing to return the HFPA's confidential client records and instead using the HFPA's confidential information to disadvantage the HFPA; (xii) accepting employment with the GGF in a manner that is adverse to the HFPA, and then using the HFPA's confidential information to disadvantage the HFPA in its dispute with his new employer; and (xiii) putting his own interests, including his desire to obtain his dream job, over the interests of his client the HFPA.

352. There is reasonable apprehension that if the Assignment remains outstanding, it will cause serious injury to the HFPA and the public.

353. The potential injury includes pecuniary loss and prejudicial alteration of the HFPA's position.

354. Based on these allegations, the HFPA seeks cancellation or rescission of the Assignment and such other relief as the Court deems just and proper.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

## TENTH CAUSE OF ACTION

**Rescission and Cancellation of Assignment [Cal. Civ. Code §§ 1689 and 3412]**

**(Assignment Tainted by APA – Fraudulent Inducement)**

**(Against Defendant GGF)**

355.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

356.   A party to a contract may rescind the contract if the consent of the party rescinding was obtained through fraud, the contract is unlawful for causes which do not appear in its terms or conditions and the parties are not equally at fault, or the public interest will be prejudiced by permitting the contract to stand.  Cal. Civ. Code § 1689.

357.   "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon her application, be so adjudged, and ordered to be delivered up or canceled."  Cal. Civ. Code § 3412.

358.   Once a contract has been found to be void and cancelled, Plaintiff is entitled to restitution of all monies paid, including closing costs and interest and principal payments.  Cal. Civ. Code § 1692.

359.   The Assignment was entered into pursuant to the APA.

360.   As set forth herein, the APA is tainted by fraudulent inducement.

361.   In connection with the negotiation and execution of the APA, Boehly and Hoehne made material misrepresentations of fact including, but not limited to, promises of employment, lifetime voting, cash compensation, travel allowances, lifetime tickets to the Golden Globes Awards ceremony, and profit sharing, and concealed material facts, including, but not limited to, facts relating to the bid process and Hoehne and Boehly's efforts to obstruct that process.

362.   As to Hoehne, during an informational Zoom meeting with the HFPA membership held on or about July 15, 2022, Hoehne told the members that they

would have lifetime Golden Globes voting rights and travel allowances to film festivals even if they did not accept employment with Newco. At the time Hoehne made this statement, she knew it to be false or misleading and/or acted with reckless disregard to the truth or completeness of the statement, including, but not limited to, because she blindly accepted at face value Boehly's promises to not condition voting and travel on employment with Newco without conducting any due diligence or entering into written agreements to assess, verify, and/or ensure the truthfulness of this statement. Hoehne made this misrepresentation with the intent to induce the HFPA and its members to vote to ratify the APA so she could secure her own employment with Newco and because she knew that, because voting rights and attending film festivals were essential to the work of HFPA members, it would be wholly illogical for the HFPA to agree to sell the Golden Globes without those assurances, especially given that no cash compensation would ultimately be paid to the HFPA or its members. In short, Hoehne obtained and conveyed empty promises that would be difficult or impossible for the HFPA to enforce so she could ensure Boehly did just enough to placate the members, pass the APA vote, and secure a favorable outcome for herself.

363. Further, at informational meetings with the HFPA membership held on Zoom and at the Maybourne Hotel in Beverly Hills on or about July 15, 2022 and July 21, 2022, respectively, Hoehne told the HFPA membership that proceeding with the APA was the HFPA's only viable option, the go-shop process was fair and objective, the HFPA did not need more time to review the deal before voting, Boehly and Eldridge's offer was fair market value, PCE's offer was contingent on a broadcast deal, PCE's and Appleby's offers were not viable, and Boehly would keep his promises. At the time Hoehne made these statements, she knew them to be false or misleading and/or acted with reckless disregard to the truth or completeness of the statements, including, but not limited to, because she knew that the HFPA did have other viable options, the HFPA's advisors had expressly told her the go-shop period

COMPLAINT

was too short and raised questions of legitimacy, the HFPA's advisors had expressly told her she should give the members more time to consider the deal as failure to do so raised questions of legitimacy, the HFPA's advisors had expressly told her that Boehly and Eldridge's offer was "low," Boehly was obstructing the bid process and the only reason PCE's offer appeared to be contingent on a broadcasting deal was because the Boehly-controlled DCP/MRC was refusing to cooperate with PCE's due diligence inquires, there was a potential offer from Appleby that could be multiples greater than the Boehly and Eldridge offer, PCE was vying to structure a deal that would not require HFPA dissolution, Boehly and his counsel were permitted to opine on and shape the manner in which PCE's proposal was presented to the membership, and Penske and Boehly had already planned for Penske to join the deal and take over control of Newco.  Hoehne was aware of all of this information at the time the above statements were made and had a duty to disclose the information because she was the HFPA's President at the time.  Hoehne made these misrepresentations and concealed this information with the intent to induce the HFPA to enter into the APA so she could secure her own employment with Newco and because she knew that HFPA members would not vote to ratify the APA if they knew the true facts that she knew.

364.   As to Boehly, in or around late spring/early summer 2022, Boehly told the HFPA that he had been meeting with key industry figures and conducting due diligence regarding the value of the HFPA, and that through that process he had determined the Golden Globes were economically worthless and that their only viable option was to accept his offer.  At the time Boehly made this statement, he knew it to be false or misleading and/or acted with reckless disregard to the truth or completeness of the statement, including, but not limited to, because he knew multiple entities were considering offering at least tens of millions of dollars to partner with the HFPA and/or purchase the Golden Globes, he had financial experts that were giving him contrary information (*i.e.*, that the Golden Globes were not worthless), and he was making an offer to purchase the Golden Globes for significant

Kasowitz LLP
Attorneys at Law
Los Angeles

92

COMPLAINT

monetary consideration (although he would subsequently ensure the HFPA received none of that monetary consideration). Boehly made this misrepresentation with the intent of inducing the HFPA and its members to vote to ratify the HFPA.

365. Further, during the period before the APA vote, in or around the summer of 2022, Boehly expressly told the HFPA that he would not sell the Golden Globes or bring in a partner for at least 3-5 years. At the time Boehly made this statement, he knew it to be false or misleading and/or acted with reckless disregard to the truth or completeness of the statement, including, but not limited to, because immediately after Boehly became interim CEO of the HFPA in late 2021, Boehly's advisors at Alvarez were having communications with Penske concerning a licensing deal, beginning in early 2022 Hoehne—who was working closely with Boehly at the time—heavily advocated for partnerships between Penske's trades and the HFPA at the 2022 Cannes Film Festival (where she also arranged for personal meetings for Boehly to lobby HFPA members at the very same hotel where she was promoting the Penske events), and within three months of signing the APA Penske was introduced as part of the deal and it was revealed that he would be in charge of Newco and the Golden Globes. It is not plausible that Penske's involvement with a major corporate acquisition would be so quickly and abruptly announced if he had not been involved long before that announcement. Yet Boehly concealed from the HFPA and its members that Penske was involved with the APA and would ultimately be given complete control of Newco. Boehly had a duty to disclose this information because he was the HFPA's interim CEO at the time. Boehly made these misrepresentations and concealed this information with the intent to induce the HFPA to enter into the APA so he could bolster the Penske Trust and because he knew that HFPA members would not vote to ratify the APA if they knew the true facts that he knew.

366. Boehly was also present when Hoehne made misrepresentations, and instead of correcting those misrepresentations, Boehly concealed the material fact that Hoehne's statements were untrue. Specifically, Boehly was present during an

informational Zoom meeting with the HFPA membership held on or about July 15, 2022, where Hoehne told the members that they would have lifetime Golden Globes voting rights and travel allowances to film festivals even if they did not accept employment with Newco.  At the time this statement was made, Boehly concealed that neither he nor Eldridge was providing any written agreements to enforce these promises, Hoehne was blindly accepting and conveying the representations at face value without any due diligence, and Boehly and Eldridge fully intended to condition voting and travel on employment with Newco.  Boehly had a duty to disclose this information because he was the interim CEO of the HFPA at the time.  Boehly concealed this information with the intent to induce the HFPA to enter into the APA because he knew that, because voting rights and attending film festivals were essential to the work of HFPA members, it would be wholly illogical for the HFPA to agree to sell the Golden Globes without those assurances, especially given that no cash compensation would ultimately be paid to the HFPA or its members.  In short, Boehly concealed material information while Hoehne parroted his empty promises, which Boehly knew would be impossible for the HFPA to enforce, so he could ensure he did just enough to placate the members, have them ratify the APA, and secure favorable outcomes for himself and the Penske Trust.

367.  The HFPA was unaware of the above true facts and concealed information and would not have ratified the APA if they had been disclosed.  The HFPA justifiably relied on Hoehne's and Boehly's misrepresentations and concealment of material facts because they were the HFPA's President and interim CEO, respectively, at the time.

368.  As a direct and proximate result of Boehly and Hoehne's fraudulent inducement of the APA, the HFPA: (1) lost out on other potentially viable and more lucrative bids, including bids that would not have required the HFPA to dissolve; (2) entered into a one-sided deal that did not protect the HFPA's interests or the interests of its members and instead sought the HFPA's dissolution; (3) was deprived

of tens of millions of dollars in connection with the 2023 Golden Globes; (4) incurred millions of dollars in unreimbursed expenses in connection with the 2023 Golden Globes; (5) relinquished lucrative contractual rights for no consideration at all; and (6) suffered other damages in the form of attorney's fees and reputational harm in amounts to be determined at trial.

369.   Because the APA is tainted by fraud and illegality, and the Assignment was entered into pursuant to the APA, the Assignment is tainted by the same fraud and illegality that taints the underlying APA.

370.   The Assignment is voidable as a derivative agreement of the voidable APA.

371.   There is reasonable apprehension that if the Assignment remains outstanding, it will cause serious injury to the HFPA and the public.

372.   The potential injury includes pecuniary loss and prejudicial alteration of the HFPA's position.

373.   Based on these allegations, the HFPA seeks cancellation or rescission of the Assignment and such other relief as the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION

**Rescission and Cancellation of Assignment [Cal. Civ. Code §§ 1689, 3412]**

**(Assignment Tainted by APA – Breach of Fiduciary Duty – Hoehne)**

**(Against Defendant GGF)**

374.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

375.   A party to a contract may rescind the contract if the consent of the party rescinding was obtained through fraud, the contract is unlawful for causes which do not appear in its terms or conditions and the parties are not equally at fault, or the public interest will be prejudiced by permitting the contract to stand.  Cal. Civ. Code § 1689.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

95

COMPLAINT

376. "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon her application, be so adjudged, and ordered to be delivered up or canceled." Cal. Civ. Code § 3412.

377. Once a contract has been found to be void and cancelled, Plaintiff is entitled to restitution of all monies paid, including closing costs and interest and principal payments. Cal. Civ. Code § 1692.

378. The Assignment was entered into pursuant to the APA.

379. As set forth herein, the APA is tainted by Hoehne's breaches of her fiduciary duties.

380. At all relevant times, Hoehne, as the President of the HFPA, owed fiduciary duties to the HFPA and its members, including duties of loyalty, care, good faith, and fair dealing. Hoehne breached those fiduciary duties by engaging in careless, self-interested, and disloyal conduct in connection with the negotiation and approval of the APA.

381. Hoehne had a conflict of interest with respect to the HFPA and the negotiation of the APA. Hoehne acknowledged that conflict when she transitioned her role on the Special Committee to a non-voting-member role. On information and belief, Hoehne expected and/or was promised a prominent role in Boehly's media empire, and today serves as President of Globes LLC, making her the only former HFPA member to still be employed full-time by Globes LLC.

382. In furtherance of her self-interest, Hoehne actively accelerated the membership vote on the APA to ensure it would occur before a new HFPA Board might get voted into office and potentially block the deal. Hoehne accelerated the membership vote (1) against the advice of counsel who told her that a modest extension was not unreasonable and that failure to grant such extension would be the subject of scrutiny if the APA was challenged, (2) against reservations expressed by the HFPA's financial advisors, and (3) against the express requests of members who

simply asked for more than a few days to review and consider the 400-plus page contract.

383. The egregious nature of Hoehne's actions is underscored by the fact that she was undoubtedly aware of the fact that HFPA members—*her constituents at the time*—did not have enough time to properly review and understand the contract; indeed, she knew that English was not the first language of many HFPA members and that HFPA members required special training and assistance to understand contracts. As President of the HFPA, Hoehne had an obligation to make sure that HFPA members had a full and fair opportunity to review the contract and provide their informed consent. But rather than provide additional time, Hoehne assured HFPA members that the deal was good for them and that they could trust her recommendation. In fact, Hoehne only endeavored to schedule a detailed contract review session *after* the APA vote.

384. Hoehne also obstructed the bid process, deterring, misrepresenting, and/or concealing bona fide competing offers and exerting every effort to ensure that Boehly and Eldridge's bid would prevail, including by flouting the concerns of the HFPA's financial advisors who expressly advised that Hoehne allowing only two weeks for bids was unreasonable.

385. At all relevant times, Hoehne implored HFPA members to accept Boehly's one-sided deal, to trust her as well as Boehly, and to act expeditiously even when they made clear they were confused or uncertain. HFPA members justifiably relied on and placed their trust in Hoehne's representations in connection with the APA.

386. Ultimately, Hoehne acted selfishly and against the interests of the HFPA and was instrumental in obtaining terms favorable to Boehly, Eldridge, and herself and to the complete detriment—and ultimate destruction—of the HFPA.

387. As a result of Hoehne's breaches of fiduciary duty, the HFPA: (1) lost out on other potentially viable and more lucrative bids, including bids that would not

require the HFPA to dissolve; (2) entered into a one-sided deal that did not protect the organization's interests or the interests of its members and instead sought the HFPA's dissolution; (3) was deprived of tens of millions of dollars in connection with the 2023 Golden Globes; (4) incurred millions of dollars in unreimbursed expenses in connection with the 2023 Golden Globes; and (5) suffered other damages in the form of attorney's fees and reputational harm in amounts to be determined at trial.

388.   As a further result of Hoehne's breaches of fiduciary duty, the APA was not the product of arm's-length bargaining or fair dealing, but rather was tainted by disloyalty and inequitable conduct, and the resulting terms were unfair.  Hoehne failed to ensure the process was fair, and the consideration and terms were not what would be expected from an arm's-length negotiation.

389.   Because the APA is tainted by Hoehne's breaches of her fiduciary duties, and the Assignment was entered into pursuant to the APA, the Assignment is tainted by the same breaches of fiduciary duty that taint the underlying APA.

390.   The Assignment is therefore voidable as a derivative agreement of the voidable APA.

391.   There is reasonable apprehension that if the Assignment remains outstanding, it will cause serious injury to the HFPA and the public.

392.   The potential injury includes pecuniary loss and prejudicial alteration of the HFPA's position.

393.   Based on these allegations, the HFPA seeks cancellation or rescission of the Assignment and such other relief as the Court deems just and proper.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

## TWELFTH CAUSE OF ACTION

**Rescission and Cancellation of Assignment [Cal. Civ. Code §§ 1689, 3412]**

**(Assignment Tainted by APA – Breach of Fiduciary Duty – Boehly)**

**(Against Defendant GGF)**

394.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

395.   A party to a contract may rescind the contract if the consent of the party rescinding was obtained through fraud, the contract is unlawful for causes which do not appear in its terms or conditions and the parties are not equally at fault, or the public interest will be prejudiced by permitting the contract to stand.  Cal. Civ. Code § 1689.

396.   "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon her application, be so adjudged, and ordered to be delivered up or canceled."  Cal. Civ. Code § 3412.

397.   Once a contract has been found to be void and cancelled, Plaintiff is entitled to restitution of all monies paid, including closing costs and interest and principal payments.  Cal. Civ. Code § 1692.

398.   The Assignment was entered into pursuant to the APA.

399.   As set forth herein, the APA is tainted by Boehly's breaches of his fiduciary duties.

400.   At all relevant times, Boehly, as the interim CEO of the HFPA, owed fiduciary duties to the HFPA and its members, including duties of loyalty, care, good faith, and fair dealing.

401.   Boehly breached those fiduciary duties by engaging in self-interested and disloyal conduct in connection with the negotiation and approval of the APA.

402.   Specifically, Boehly breached his duty of care by agreeing to release NBC and MRC in connection with their contractual breaches regarding the 2022

Golden Globes.  On information and belief, those releases and Boehly's negotiation in connection with same directly facilitated the cancellation of the 2022 Golden Globes and the resulting perceived financial turmoil that contributed to inducing HFPA members to approve the APA.

403.   Boehly also breached his duty of loyalty, being on both sides of the transaction in multiple capacities and using that advantage to his benefit and to the detriment of the HFPA and other bidders.  First, Boehly was directly conflicted by virtue of his roles as interim CEO of the HFPA and Chairman of Eldridge during the relevant time period.  Although Hoehne and Boehly claimed that Boehly was recused from the HFPA's decision making and bid process with respect to the APA, Boehly's involvement with MRC and DCP ultimately created blatant conflicts of interest, including because one of the primary competing bids was obstructed due to a lack of cooperation on the part of DCP/MRC—a partnership that Boehly co-owned and was deeply involved with at the time.

404.   Boehly breached his duties of good faith and fair dealing by making false promises to the HFPA members—*his constituents at the time*—to induce their ratification of the APA, structuring a deal that ultimately broke those promises, working with Hoehne to rush the approval process and deprive the HFPA members of a full and fair opportunity to review the APA, working with Hoehne to ensure that the members would approve a one-sided APA that included unconscionable terms that gave Boehly and Eldridge the power to unilaterally decide critical terms *after* the execution of the APA, using his position as interim CEO to instill fear in the HFPA members and convince them that a sale was necessary, and using his involvement in other companies to obstruct the bid process and deter competing bids.  HFPA members justifiably relied on and placed their trust in Boehly's representations in connection with the APA.

405.   As a result of Boehly's breaches of fiduciary duty, the HFPA: (1) lost out on other potentially viable and more lucrative bids, including bids that would not

require the HFPA to dissolve; (2) entered into a one-sided deal that did not protect the organization's interests or the interests of its members and instead sought the HFPA's dissolution; (3) was deprived of tens of millions of dollars in connection with the 2023 Golden Globes; (4) incurred millions of dollars in unreimbursed expenses in connection with the 2023 Golden Globes; (5) relinquished lucrative contractual rights for no consideration at all; and (6) suffered other damages in the form of attorney's fees and reputational harm in amounts to be determined at trial.

406.   Because of Boehly's breaches of fiduciary duty, the APA was not the product of arm's-length bargaining or fair dealing, but rather was tainted by disloyalty and inequitable conduct, and the resulting terms were unfair.  Boehly failed to ensure the process was fair, and the consideration and terms were not what would be expected from an arm's-length negotiation.

407.   Because the APA is tainted by Boehly's breaches of his fiduciary duty, and the Assignment was entered into pursuant to the APA, the Assignment is tainted by the same breaches of fiduciary duty that taint the underlying APA.

408.   The Assignment is therefore voidable as a derivative agreement of the voidable APA.

409.   There is reasonable apprehension that if the Assignment remains outstanding, it will cause serious injury to the HFPA and the public.

410.   The potential injury includes pecuniary loss and prejudicial alteration of the HFPA's position.

411.   Based on these allegations, the HFPA seeks cancellation or rescission of the Assignment and such other relief as the Court deems just and proper.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

101

COMPLAINT

## THIRTEENTH CAUSE OF ACTION

**Rescission and Cancellation of Assignment [Cal. Civ. Code §§ 1689, 3412]**

**(Assignment Tainted by Legal Malpractice and Breach of Fiduciary Duty)**

**(Against Defendant GGF)**

412.   The HFPA incorporates the allegations in paragraphs 1 through 231 above and paragraphs 455 through 462 and 464 through 471 below, as though fully set forth herein.

413.   A party to a contract may rescind the contract if the consent of the party rescinding was obtained through fraud, the contract is unlawful for causes which do not appear in its terms or conditions and the parties are not equally at fault, or the public interest will be prejudiced by permitting the contract to stand.  Cal. Civ. Code § 1689.

414.   "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon her application, be so adjudged, and ordered to be delivered up or canceled."  Cal. Civ. Code § 3412.

415.   Once a contract has been found to be void and cancelled, Plaintiff is entitled to restitution of all monies paid, including closing costs and interest and principal payments.  Cal. Civ. Code § 1692.

416.   As set forth in paragraphs 449 through 456 and 458 through 465 below, Goeckner committed legal malpractice and breached his fiduciary duties to the HFPA, and the HFPA suffered damages as a result of those breaches.

417.   Because the Assignment is tainted by Goeckner's legal malpractice and breaches of fiduciary duty, the Assignment is voidable.

418.   There is reasonable apprehension that if the Assignment remains outstanding, it will cause serious injury to the HFPA and the public.

419.   The potential injury includes pecuniary loss and prejudicial alteration of the HFPA's position.

420. Based on these allegations, the HFPA seeks cancellation or rescission of the Assignment and such other relief as the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION

### Declaratory Judgment

### [Cal Civ. Proc. Code § 1060 and Cal. Bus. & Prof. Code § 16722]

### (Assignment Unlawful, Void, and Unenforceable)

### (Against Defendant GGF)

421. The HFPA incorporates the allegations in paragraphs 1 through 231, 344 through 354, 356 through 373, 375 through 393, 395 through 411, and 413 through 420 above as though fully set forth herein.

422. There is an ongoing dispute between the HFPA and the GGF concerning funds that were fraudulently transferred in connection with the Assignment and Defendants' ongoing attempts to use the Assignment as part of their scheme to destroy the HFPA. The HFPA contends that the Assignment is invalid and unenforceable in light of the malfeasance and unlawful conduct set forth above. The GGF disputes that contention.

423. Unless and until this Court grants declaratory relief, the HFPA faces ongoing uncertainty and potential harm from being bound by an unlawful agreement.

424. Pursuant to the foregoing, an actual and justiciable controversy exists between the parties as to the validity and enforceability of the Assignment.

425. The HFPA is entitled to a declaration that the Assignment is unenforceable, void, or voidable because the Assignment is unlawful both in its own right and as derivative of the tainted APA.

## FIFTEENTH CAUSE OF ACTION

### Fraudulent Misrepresentation

### (Against Defendants Goeckner and GGF)

426. HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

427. Goeckner induced the HFPA's Treasurer to unlawfully transfer approximately $4 million to the GGF through intentional misrepresentations of fact.

428. Goeckner's statement to the Treasurer after sending the July 29 Email that Board approval of the transfers from the Reserve was not required was false, and, on information and belief, Goeckner knew the statement was false when he made it, including because as the former General Counsel of the HFPA he was thoroughly familiar with the HFPA bylaws and he knew that depleting the Reserve without Board approval would be a violation of those bylaws.

429. As part of his effort to induce the unlawful transfer and retain an ability to meddle in HFPA affairs, Goeckner told the Treasurer that although he was no longer serving as HFPA General Counsel or Chief Operating Officer, he retained an "advisor" role that purportedly authorized him to instruct the Treasurer. That statement was also false, and Goeckner knew it was false when he made it, because Goeckner never retained such a position and it was never authorized by the Board, and Goeckner has since admitted as much.

430. At around the same time in July and August of 2024, Goeckner instructed the Treasurer to transfer an additional sum of approximately $1 million to the GGF, telling the Treasurer that the transfer was authorized for purported payments of HFPA obligations to law firms and other expenses. That statement was also false, and Goeckner knew it was false when he made it, including because he knew those liabilities had already been assumed by the GGF under the Assignment and thus were not the HFPA's responsibility.

431. Goeckner made these misrepresentations to the Treasurer with the intent of inducing the Treasurer to unlawfully transfer funds to the GGF.

432. In reliance on Goeckner's misrepresentations, the Treasurer transferred approximately $4 million of the Reserve to the GGF pursuant to Goeckner's instructions.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

104

COMPLAINT

433. The Treasurer, who is not an attorney or an accountant, was justified in relying on Goeckner's misrepresentations because Goeckner had served as the HFPA's trusted General Counsel and COO and claimed to be acting in a residual capacity of those roles as a purported advisor to the HFPA.

434. Goeckner made the aforementioned false representations within the scope of his employment as CEO of the GGF and for the benefit of the GGF, and his statements were authorized and subsequently ratified by the GGF, including as evidenced by the GGF's refusal to return the unlawfully transferred funds.

435. As a direct and proximate result of Goeckner's and the GGF's fraudulent conduct, the HFPA was deprived of approximately $4 million, which the organization needs to continue fulfilling its obligations under California law, including its obligations to defend and prosecute claims in connection with the corrupt APA.

436. Goeckner's and the GGF's conduct was despicable and carried out with a willful and conscious disregard for the HFPA's rights, constituting oppression, fraud, and malice within the meaning of California Civil Code § 3294. As such, the HFPA is entitled to exemplary and punitive damages to the fullest extent permitted by law.

## SIXTEENTH CAUSE OF ACTION

### Transaction Void For Violation of Corporate Authority

### (Against Defendant GGF)

437. The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

438. Under HFPA bylaws, specific Board authority was required to reduce the $5 million Reserve.

439. The approximately $4 million that Goeckner induced the Treasurer to transfer to the GGF was transferred without specific Board authority, violated the

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

105

COMPLAINT

HFPA's bylaws and corporate governance requirements, and was unfair and unreasonable to the HFPA.

440. Goeckner and the GGF failed to act in good faith and with a view to the interests of the HFPA.

441. The transfer was therefore made in violation of corporate authority, and is therefore void.

442. The HFPA is entitled to the return from the GGF of the approximately $4 million, along with such other and further relief as the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION

### Unjust Enrichment

### (Against Defendant GGF)

443. The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

444. Goeckner, acting within the scope of his employment and for the benefit of the GGF, fraudulently induced the HFPA to unlawfully transfer approximately $4 million to the GGF.

445. The GGF unjustly benefited from receipt of these fraudulently transferred funds at the expense of the HFPA, to which the funds rightfully belong.

446. The GGF has been unjustly enriched and its actions have caused damage to the HFPA.

447. The HFPA is entitled to restitution, the imposition of a constructive trust, disgorgement of the fraudulently transferred funds, prejudgment interest, and/or any other relief the Court deems just and proper.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

106

COMPLAINT

## EIGHTEENTH CAUSE OF ACTION

### Imposition of Constructive Trust

### (Against Defendant GGF)

448.  The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

449.  The GGF received approximately $4 million that rightfully belongs to the HFPA.

450.  The GGF obtained the approximately $4 million through Goeckner's fraud, breach of fiduciary duty, legal malpractice, and other malfeasance.

451.  It would be inequitable for the GGF to retain these unlawfully acquired funds.

452.  In the interest of fairness, justice, and equity, this Court can and should issue an order and enter judgment: (i) imposing a constructive trust over the approximately $4 million; (ii) decreeing that the GGF holds such funds in trust for the benefit of the HFPA; and (iii) requiring the GGF to disgorge those funds to the HFPA.

453.  Accordingly, the HFPA seeks, in addition to other relief, the imposition of a constructive trust on the unlawfully transferred funds and prejudgment interest.

## NINETEENTH CAUSE OF ACTION

### Legal Malpractice and Breach of the Fiduciary Duty of Care

### (Against Defendant Goeckner)

454.  The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

455.  At all relevant times, Goeckner was an attorney licensed to practice law in the State of California.

456.  During the period June 1, 2013 through and including June 30, 2024, Goeckner served as General Counsel to the HFPA.

457. As the HFPA's attorney, Goeckner had a duty of care to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise, as well as to abide by the California Rules of Professional Conduct.

458. Goeckner committed legal malpractice and breached his fiduciary duty of care by, among other things: (i) advising the HFPA to gift away millions of dollars for no consideration through the unlawful Amendment to the APA; (ii) facilitating the unlawful Amendment to the APA, including by failing to allow the HFPA due time to consider the corresponding resolution, belatedly notifying the HFPA Board about the proposed resolution, and failing to advise the HFPA as to its rights and remedies relating to the Amendment and the financial consequences of entering into it; (iii) allowing and facilitating Hoehne and Boehly's efforts to release the HFPA's claims against NBC and MRC and depriving the HFPA of any recourse in connection with the 2023 Golden Globes; (iv) negotiating the Assignment after he had already accepted a role as CEO of the GGF, the HFPA's counterparty to the Assignment, and signing the Assignment in his capacity as GGF CEO; (v) burying a backdoor provision in the June 2024 Resolution while serving as HFPA General Counsel in order to facilitate his efforts to induce fraudulent transfers from the HFPA to his new employer once he officially assumed the role as GGF CEO; (vi) advising the HFPA to enter into the Assignment and claiming it was in the HFPA's best interest when it was not; (vii) fraudulently inducing the Treasurer to unlawfully transfer funds from the HFPA to the GGF in an effort to deprive his former client of approximately $4 million; (viii) involving himself on behalf of the GGF in disputes with the HFPA that are substantially related to matters in which he represented the HFPA, and acting against the HFPA's interest in those disputes without the HFPA's informed written consent; (ix) threatening GGF members to prevent them from agreeing to return the unlawfully transferred funds; (x) conspiring with Penske, Boehly, Hoehne, and the Penske Trust to destroy the HFPA; (xi) refusing to return the HFPA's confidential client records and instead using the HFPA's confidential information to disadvantage

the HFPA; (xii) accepting employment with the GGF in a manner that is adverse to the HFPA, and then using the HFPA's confidential information to disadvantage the HFPA in its dispute with his new employer; and (xiii) putting his own interests, including his desire to obtain his dream job, over the interest of his client the HFPA.

459.   As set forth herein, Goeckner's actions injured the HFPA in matters in which he previously represented the HFPA, including with respect to the Assignment, the APA, the Reserve, dissolution, and the unlawful transfer of approximately $4 million.

460.   Goeckner's breaches of his fiduciary duty of care and failure to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession proximately caused the HFPA to suffer damages in the form of, among other things, millions of dollars of unlawfully transferred assets and millions of dollars in legal fees.  All of this damage would have been avoided had Goeckner maintained his duty of care to his client and exercised the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession instead of vying for his own interests and the interests of Penske, Boehly, Hoehne, and the unlawful Penske Trust.

461.   As a result of Goeckner's malpractice and breaches of the fiduciary duty of care, he is jointly and severally liable for the entirety of the HFPA's damages, including, but not limited to, the costs and expenses incurred to investigate and remedy his misconduct and the Defendants' malfeasance and other harm caused by the corrupt Assignment, APA, and fraudulent transfers.

462.   Goeckner's conduct was despicable and carried out with a willful and conscious disregard for the HFPA's rights, constituting oppression, fraud, and malice within the meaning of California Civil Code § 3294.  As such, the HFPA is entitled to exemplary and punitive damages to the fullest extent permitted by law.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

## **TWENTIETH CAUSE OF ACTION**

### **Breach of the Fiduciary Duty of Loyalty**

### **(Against Defendant Goeckner)**

463.   The HFPA incorporates the allegations in paragraphs 1 through 231 above as though fully set forth herein.

464.   At all relevant times, Goeckner was an attorney licensed to practice law in the State of California.

465.   During the period June 1, 2013 through and including June 30, 2024, Goeckner served as General Counsel to the HFPA.

466.   As the HFPA's attorney, Goeckner had a duty of loyalty to act at all times in a good-faith belief that his actions were in the best interests of the HFPA.

467.   Goeckner breached his fiduciary duty of loyalty to the HFPA by, among other things: (i) negotiating an agreement for the HFPA after he had already accepted employment with the counterparty to that same agreement, and then signing that agreement in his role as CEO of the counterparty: (ii) burying a backdoor provision in the June 2024 Resolution while serving as HFPA General Counsel in order to facilitate his efforts to induce fraudulent transfers from the HFPA to his new employer once he officially assumed the role as GGF CEO; (iii) advising the HFPA to enter into the Assignment and claiming it was in the HFPA's best interest when it was not, and it was instead in the best interest of himself and his new employer; (iv) fraudulently inducing the Treasurer to unlawfully transfer funds from the HFPA to the GGF in an effort to deprive the HFPA of approximately $4 million; (v) involving himself on behalf of the GGF in disputes with the HFPA that are substantially related to matters in which he represented the HFPA,  and acting against the HFPA's interest in those disputes without the HFPA's informed written consent; (vi) failing to recuse himself from disputes between the HFPA and the GGF concerning matters substantially related to matters in which he represented the HFPA, and instead unlawfully and baselessly threatening GGF members to prevent

them from returning the unlawfully transferred funds to the HFPA; (vii) conspiring with Penske, Boehly, Hoehne, and the Penske Trust to destroy the HFPA; (viii) refusing to return the HFPA's confidential client records and instead using the HFPA's confidential information to disadvantage the HFPA; (ix) accepting employment with the GGF in a manner that is adverse to the HFPA, and then using the HFPA's confidential information to disadvantage the HFPA in its dispute with his new employer; (x) misleading the HFPA by claiming that he retained an advisory role with the HFPA, when he did not, and then using that false role to fraudulently insert himself into the HFPA's affairs, cover up his malfeasance, obstruct the HFPA's efforts to investigate the APA and the Assignment, and further obstruct the HFPA's efforts to retrieve the unlawfully transferred funds; and (xi) putting his own interests, the interests of his new employer, and the interests of Penske, Hoehne, and Boehly over the interests of the HFPA.

468.   Goeckner has acted in a manner that harms the interests of the HFPA and undermines the trust inherent in his prior attorney-client relationship with the HFPA.

469.   Goeckner's breaches of his fiduciary duty of loyalty caused the HFPA to suffer damages in the form of, among other things, millions of dollars of fraudulently transferred assets and millions of dollars in additional legal fees.  All of this damage would have been avoided had Goeckner maintained his duty of loyalty to his clients instead of vying for his own interests and the interests of the unlawful Penske Trust.

470.   As a result of Goeckner's breaches of the fiduciary duty of loyalty, he is jointly and severally liable for the entirety of the HFPA's damages, including, but not limited to, the costs and expenses incurred to investigate and remedy his misconduct and the Defendants' malfeasance and other harm caused by the injury to the HFPA's reputation.

471.  Goeckner's conduct was despicable and carried out with a willful and conscious disregard for the HFPA's rights, constituting oppression, fraud, and malice within the meaning of California Civil Code § 3294.  As such, the HFPA is entitled to exemplary and punitive damages to the fullest extent permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, the HFPA respectfully requests judgment in its favor and against Defendants as follows:

A.    Damages in an amount to be determined at trial, but at least $150 million;

B.    Treble damages;

C.    Rescission and/or cancellation of the Assignment;

D.    Injunctive relief;

E.    Pre- and post-judgment interest at the maximum rate allowed by law;

F.    Punitive damages in an amount to be determined at trial;

G.    Attorney's fees and costs as allowed by law; and

H.    Such other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues and causes of action triable by jury.

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

112

COMPLAINT

DATED: July 28, 2026

**KASOWITZ LLP**

By: */s/ Daniel A. Saunders*
　　　Daniel A. Saunders
　　　Robert W. Bosslet
　　　1801 Century Park East, Suite 1830
　　　Los Angeles, CA 90067
　　　Telephone: (424) 288-7904
　　　DSaunders@kasowitz.com
　　　RBosslet@kasowitz.com

　　　Dwayne A. Amos
　　　Kristine B. Abrenica
　　　1633 Broadway
　　　New York, NY 10019
　　　Telephone: (212) 506-1912
　　　DAmos@kasowitz.com (*pro hac vice*
　　　application forthcoming)
　　　KAbrenica@kasowitz.com
　　　(*pro hac vice* application
　　　forthcoming)

　　　*Attorneys for Plaintiff*
　　　*Hollywood Foreign Press Association*

KASOWITZ LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT